### In re ASSOCIATED GROCERS OF COLORADO, INC., Debtor.

#### Bankruptcy No. 86 B 09650 C.

United States Bankruptcy Court, D. Colorado.

July 6, 1990.

418

Susan L. Linsley, Hughes & Dorsey, Denver, Colo., for debtor.

Caroline C. Fuller, Fairfield & Woods, Denver, Colo., for official unsecured creditors' committee.

Dolores B. Kopel, Denver, Colo., for various grocer members.

Stephen D. Shirey, Denver, Colo., for Acting U.S. Trustee.

## OPINION AND ORDER ON FEES OF HUGHES & DORSEY

PATRICIA A. CLARK, Bankruptcy Judge.

### I. INTRODUCTION

This matter is before the Court on the Final Fee Application of Hughes & Dorsey (H & D or Applicant) pursuant to the provisions of 11 U.S.C. § 330. A hearing was held on this matter.

From the commencement of the case, October 10, 1986, through confirmation, April 21, 1989, H & D *billed* total costs and fees at their usual hourly rate in the amount of $1,134,336.35. In their Final Fee Application, however, H & D *requests* $1,072,135.10. H & D reduced the amount billed in part on their own initiative and the balance in response to the objections of certain creditors and the Creditors' Committee. H & D has already received payments in the sum of $985,568.37 for fees and expenses.

H & D acted as debtor's counsel from the onset of the case pursuant to an Order dated October 27, 1986. On June 30, 1988, however, an Order entered approving Otten, Johnson, Robinson, Neff & Ragonetti, P.C. (O & J, *et al.*), as debtor's counsel replacing H & D. Thereafter the debtor retained H & D as special counsel to continue to represent it in certain matters specified in the exhibit attached to the June 30, 1988 Order.

Throughout the course of this case, H & D filed six applications for interim compensation. Initially, the Creditors' Committee, Steel Markets, Inc., and other members of the debtor's cooperative filed specific objections to the fees requested. The Creditors' Committee objection to the final fee application incorporates the substance of these objections. The Creditors' Committee believes that in general the fees requested are excessive considering the nature of this case, which was a liquidating Chapter 11. The Committee has also lodged specific objections, to be addressed below, and urges an additional reduction of $55,000.

### II. BACKGROUND

■ It is necessary at the outset to comment generally on the nature of this case and some factors which the Court observed in reviewing this application and the previously submitted applications. As other courts have commented, reviewing fees is a difficult and troublesome process particularly in cases of this size. Nevertheless, the Court is charged with that responsibility in the Code and must undertake such review even in the absence of objections.

H & D had an established relationship with the debtor prior to the filing of the bankruptcy. It had been counsel to the debtor for all of its legal affairs. The

debtor, Associated Grocers (AG), was a Colorado cooperative association for the distribution of food and other grocery products to independent grocery stores in Colorado. As of the petition date, AG served members in Colorado, New Mexico, Wyoming and Nebraska. The major goal of the cooperative was to provide the independent grocer the collective purchasing power necessary to compete with larger supermarkets.

The debtor filed for Chapter 11 relief on October 10, 1986. The debtor decided to liquidate early in the case and ceased operating on December 2, 1986, less than 60 days after the filing. The Chapter 11 plan, which was proposed by the Creditors' Committee, during the tenure of O & J, *et al.*, was a liquidating plan which resolved disputes between various types of claimants. The peculiar nature of the membership structure of the debtor, however, gave rise to a novel legal issue. The significant disputes between the factions were resolved after negotiation and incorporated in the Plan.

Any Chapter 11 proceeding of this proportion is inherently complex and requires counsel with expertise in reorganization bankruptcies, however, a liquidating Chapter 11 of this type, while still challenging to counsel, is more straightforward. The debtor in some organized fashion sells all of its assets pursuant to Section 363 or the plan and the proceeds are distributed to the creditors. Thus, with certain exceptions, the pleadings, whether motions or plan, do not require extraordinary skill.

In any case, the membership structure was the critical factor which complicated this case. Apparently, upon becoming a member of the cooperative, each store paid a fixed fee in exchange for shares of the common stock in the cooperative. During the course of the membership when that member store made purchases, a percentage surcharge was retained by AG. Those funds were allocated pursuant to the cooperative bylaws to the members and certificates reflecting such allocations were issued to the members. The question which arose and which had a pervasive impact was whether these certificates represented debt or equity obligations of the debtor. Throughout, all significant parties have come to refer to this as the "debt/equity" issue and it will be referred to as such hereinafter.

Another factor which contributed to the complexity of the case was the number of reclamation claims brought in the early part of this case. This had direct bearing on the debtor's efforts to collect accounts receivable and could only be resolved upon a determination of the debt/equity issue. Ultimately, the issues were resolved by an agreement which was incorporated into the Plan.

In addition to the foregoing, the case was complicated because the debtor had not adequately maintained its books and records. This had particular significance when the debtor, its counsel and the Creditors' Committee were evaluating claims and collection of accounts receivables. This problem hampered their efforts to determine the actual amounts of particular claims and the aggregate of any particular class. In fact, accountants were appointed to reconcile the debtor's books.

## III. APPLICABLE LAW

Section 330 forms the pivotal point for this Court's analysis. 11 U.S.C. § 330 states in pertinent part:

[T]he court may award ... to a professional person employed under Section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such ... attorney, ... and by any paraprofessional persons employed by such ... attorney based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

The critical elements of any analysis of an award of fees under this provision are embodied in the language of Section 330. The fees must be reasonable and necessary, and the estate must receive val-

ue from such services. *E.g., In re Taylor,* 100 B.R. 42 (Bankr.D.Colo.1989); *In re First Software Corporation,* 79 B.R. 108 (Bankr.D.Mass.1987); *In re Holthoff,* 55 B.R. 36 (Bankr.E.D.Ark.1985). In addition, the Tenth Circuit in *In the Matter of Permian Anchor Services, Inc.,* 649 F.2d 763 (10th Cir.1981) adopted the standards for reviewing fees set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). The Fifth Circuit enunciated the following factors for courts to consider in reviewing fee applications:

> 1. The time and labor required;
> 2. The novelty and difficulty of the questions.
> 3. The skill requisite to perform the legal service properly;
> 4. The preclusion of other employment by the attorney due to acceptance of the case;
> 5. The customary fee;
> 6. Whether the fee is fixed or contingent;
> 7. Time limitations imposed by the client or the circumstances;
> 8. The amount involved and the results obtained;
> 9. The experience, reputation and ability of the attorneys;
> 10. The "undesirability" of the case;
> 11. The nature and length of the professional relationship with the client; and
> 12. Awards in similar cases. *Id.* at 717–719.

As pointed out by Judge Matheson in *In re Lederman Enterprises, Inc.,* 106 B.R. 674 (Bankr.D.Colo.1989), the application of the *Johnson* standards becomes more difficult when applied to a bankruptcy proceeding where there are a wide variety of issues. More recently the Supreme Court reaffirmed its view that "the *Johnson* factors may be relevant in adjusting the *lodestar* amount, but no one factor is a substitute for multiplying reasonable billing rates by a reasonable estimation of the number of hours expended on the litigation." *Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989).

There are other settled points of law concerning the determination of attorneys' fees. One is that the fee applicant bears the burden of proof in all fee matters. *E.g., In re Grayhall Resources, Inc.,* Case No. 86 B 3547 E, 1990 WL 314011 (Bankr.D.Colo. March 21, 1990); *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557 (Bankr.D.Utah 1985). Another point is that the entries on the billing statements must contain adequate detail and analysis of each task so that the Court may discern the nature or substance of the services. *E.g., Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983); *In re Seneca Oil Company,* 65 B.R. 902 (Bankr.W.D.Okla.1986). Hence, where services are listed or lumped together without any specific indication of the time spent on each service the explanation is inadequate. *See, e.g., In re Beverly Manufacturing Corporation,* 841 F.2d 365 (11th Cir.1988). Furthermore, the Court must resolve any uncertainties arising due to inadequate records against the Applicants. *E.g., Jensen–Farley,* 47 B.R. at 582. As the court noted in *In re Kroh Brothers Development Co.,* 105 B.R. 515, 525 (Bankr.W.D.Mo.1989),

> The Court should not be required to indulge in guesswork, nor undertake extensive labor to justify a fee for an attorney who has not done so himself. We do not find it to be an unbearable burden to require an attorney seeking compensation to enlighten the Court as to the nature of his toil and the relation it bears to the matters at hand. Absent such a statement, compensation may not be allowed. (Citation omitted.)

It is also accepted that the estate should not bear the burden of duplication of services. *E.g., In re Liberal Market, Inc.,* 24 B.R. 653, 661 (Bankr.S.D.Ohio 1982).

Finally, courts have found that in cases like this one involving a number of attorneys and a large amount of hours claimed, "an across-the-board reduction is a necessary but fair expedient to correct for excessive or duplicative hours." *In re General Oil Distributors,* 51 B.R. 794, 802 (Bankr. E.D.N.Y.1985) (citation omitted).

■ The Supreme Court states that in applying for fees, attorneys "should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). As noted by Judge Matheson in *Grayhall supra*, "[i]n the private sector 'billing judgment' is an important component in fee setting which is not less important when the fees are to be set by the court." Slip op. at p. 8 citing *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983). Thus, where the Applicant has not exercised "billing judgment" it is appropriate for the Court to do so.

As for reimbursement for costs, compensation for overtime, deliveries and customary overhead is not allowed. *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557. With respect to the recovery of overtime expenses, Judge Matheson previously observed in *In re Lederman Enterprises, Inc., supra,* that the mere entry of overtime recovery for staff, presumably secretarial and clerical, who have worked later than 5:00 p.m. is not necessarily recoverable and may be more in the nature of an overhead expense which the law firm must absorb. 106 B.R. at 687.

The *Lederman* court also observed, "it is fashionable for counsel to utilize Federal Express to send pleadings and documents to clients. While there may be occasions when speed is critical, the utilization of special mail services is not justifiable as an expense of a debtor's estate when it is utilized in the ordinary course." *Id.* Thus, for the Court to approve such an expense there must be appropriate justification set forth in the billing statement or narrative.

■ With respect to compensation for computer time, there has been a split across the nation on whether such costs may be treated as an administrative expense. In *In re Standard Metals Corporation*, 105 B.R. 625, 627 (Bankr.D.Colo. 1989), this Court adopted the position that such expense may be compensable where it is both necessary and attributable to a particular client. In addition, the billing statement must indicate the date, the person conducting the search, length of the search, as well as providing evidence of the necessity for the use of the service. When such justification is not provided, the time is not compensable.

## IV. GENERAL COMMENTS AND APPROACH

With the recommendations of the Supreme Court in mind, this Court has reviewed the H & D final and interim fee applications and the billing statements attached thereto, the direct testimony affidavits and the transcript of the hearing. The Court first considered the reasonableness of the billing rates and then, the reasonableness of hours expended. The inquiry into the reasonableness of hours expended involved a three-tiered analysis of the billing statements.

■ analysis of the billing statements entailed a cursory review of the billing statements for any obvious problems such as duplication, inadequate or no explanation for telephone calls or phone conferences, or clearly inappropriate entries. Next, the Court analyzed the time billed per task to insure that only a reasonable amount of time was spent on a particular task and that it was properly delegated. Finally, the Court considered the overall result for each task in light of the overall case. While in some instances it may be appropriate for the Court to reduce the fees by subtracting or reducing the fees billed by the amount of the line entry, in a fee application of this size that method of reduction is nearly impossible. Instead, the Court has attempted to correlate the degree of problems detected to a percentage and reduced the fees accordingly. *See In re General Oil Distributors, Inc.*, 51 B.R. 794.

To the extent that a legal matter can be isolated, H & D billed the debtor by assigning that matter a number, or an account category for lack of better description. Attorneys then billed their time and costs for tasks related to that matter to the assigned

account category.[1] H & D filed a Summary Statement along with its Final Fee Application setting forth the total of fees and billed hours in each category. The Court will use the figures from that Statement in its calculations throughout the opinion.

■ Prior to delving into its detailed analysis of these various account categories, this Court must comment that *generally* H & D's billing records contain inadequate explanations of the services rendered. Frequently, services are listed together without any notation of the specific amount of time spent on a particular task.

■ There also appears a number of instances of duplication of effort and improper delegation of tasks. For example research of sophisticated bankruptcy issues has been done by attorneys inexperienced in bankruptcy law without any corresponding reduction in the time billed.[2]

It is glaring that one attorney in particular who appears to have established and maintained the primary relationship with AG rather consistently billed at a premium. Notwithstanding his background as a corporate and cooperative law attorney, he billed AG at his full hourly rate for lengthy conferences on bankruptcy matters. His time will be discussed within the particular cost centers where he has billed substantial amounts of time.

It is also clear from the records, particularly in the early part of the case, that H & D did a lot of client "hand holding." There are a number of entries in the billing statements of phone conversations to various board members by various members of the firm of H & D on the same day and about the same subject matter; or where debtor's counsel is performing tasks which could and should be performed by the debtor.

It must be emphasized that the inadequacies referred to are not isolated. The billing statements are replete with entries of telephone calls which are completely unexplained.

■ Finally, other factors which are important and must be considered are both the aggregate and relative amounts of professional fees awarded in this case overall. O & J, *et al.,* substitute debtor's counsel who was retained in June, 1988, less than one year prior to confirmation, was awarded fees in the amount of $113,570.75 and expenses of $10,954.27. The Creditors' Committee, which propounded the plan which was confirmed, was awarded final fees in the amount of $231,041.50 and expenses of $9,356.20. In addition, there were other professionals such as accountants who have been awarded aggregated fees in excess of $800,000. The Court also awarded approximately $61,683 in attorneys' fees to three creditor applicants who substantially contributed to the estate through their work in the debt/equity litigation. It is noteworthy that H & D has requested fees significantly in excess of the aggregate of the fees awarded to the other law firms in this case.

■ As for the recovery of costs, the itemizations indicate that a number of the changes are for hand deliveries, telecopies,

---

1. H & D used a number and letter system (*e.g.* 4000.1 or 4000.3A–I) until the period covered by the Fourth Fee Application. At that time H & D switched to all numbers (*e.g.,* 4000.1 or 4000.- 301, .302, etc.). Thus in referring to these various account categories throughout this opinion the reference may change. H & D failed to explain this transition but the Court has assumed that the "all numbers" directly correspond to the number and letter system.

2. This Court agrees with Judge Matheson's analysis of the expertise and experience of H & D contained in *In re Grayhall, supra,* slip op. pp. 18–20. He noted that H & D's expertise has historically *not* been in bankruptcy. In addition he stated,

[t]he lack of experience of these attorneys led, inescapably, to excessive and duplicitous billings. Unquestionably, the lack of experience was a strong contributing factor in the number of intraoffice conferences. *Young attorneys, who are presented with difficult matters to handle, are prone to seek advice from the partners in charge, or from their peers. They are apt to waste time on unimportant matters because they do not have the depth of experience to know what is important and what is not.* They must spend significant hours in research on matters which would be second nature to experienced counsel. (Emphasis added.)

Federal Express deliveries, overtime recovery and computer research. Those are not charges that the Court typically allows or if allowed there must be justification and proper documentation of those costs. In fact, pursuant the its Fee Application Guidelines, with the exception of computer research, those matters are non-compensable. None of H & D's itemizations properly document or explain why those costs were necessary.

As an aside, throughout the review of this Fee Application the Court has been troubled by the role which the Creditors' Committee has taken in this process. In its various objections and at the hearing the Committee strongly asserted that the fees appear excessive, but that it had difficulty supporting that perception. In some cases the Committee made very strong objections to substantial fees but then recommended only nominal reductions in the fee amount. If the Court can review and evaluate the fees so could the Creditors' Committee who had firsthand information and the greatest interest in the outcome. This phenomenon is rather curious and it can be explained by one of two rationales. Either the Committee did not put forth genuine effort in reviewing the statements or the Committee counsel was motivated by a concern that debtor would strenuously object to their fees. In either case, the Committee, while certainly of some assistance, failed to provide appropriate input to the Court in the process.

## V. ANALYSIS

### A. *Reasonable Billing Rates*

Attached hereto as Exhibit A ▪ is a list of the H & D attorneys who performed services for the debtor, their specialty and their usual hourly rates. A total of 13 attorneys performed certain services in this case. The only attorneys who are listed as bankruptcy specialists are An-

drew C. Snyder (ACS), David L. Honeck (DLH) and Susan L. Linsley (SLL). Mr. Snyder's billing rate throughout the course of the case range from $150 to $175. Mr. Honeck and Ms. Linsley's rates ranges from $80 to $100 during the case.[3] H & D notes that these rates are the same as those charged to all of H & D's clients in usual course of business.

As set forth in *Ramos v. Lamm, supra* at 555, the rates charged to other clients may be relevant, but it is not conclusive. What the Court should consider is a billing rate for each lawyer based upon the norm for comparable attorneys in the area.[4] From this Court's experience, the hourly rates are facially reasonable. In some instances the rate charged may be high based on the services rendered, where effort is duplicated, or where attorneys who have an expertise in a certain area which warrants a higher billing rate are practicing outside of their field of expertise. That, however, is more easily dealt with below.

### B. *Reasonable Estimation of Number of Hours Expended*

The Court has selected 13 major areas to review in some detail. Although there were broad objections made to fee applications with respect whether services benefitted the estate, the duplication of effort, and unnecessary and unreasonable time billed, none of the objectors provided the Court with a comprehensive list of specific dates of the alleged abuses. As a result, the Court expended an inordinate amount of time reviewing H & D's billing statements in order to determine if and when there was a duplication of effort, unreasonable or unnecessary billing and whether there was a benefit to the estate.

It is unwieldy for the Court to write out every line item examined which illuminated some problem in the billing statement. Ac-

---

**3.** It is noteworthy that Ms. Linsley graduated from law school and was admitted to the Bar in 1986, the same year that this bankruptcy case was filed.

**4.** This standard does not preclude a national comparison where the case is of national scope and involves attorneys from various parts of the country. *See, e.g., In re Seneca Oil Co.,* 65 B.R. 902 (Bankr.W.D.Okla.1986); *In re Four Star Terminals, Inc.,* 42 B.R. 419 (Bankr.D.Ark.1984).

cordingly, only where it is particularly helpful will the actual line item dates and entries be printed in the text. Otherwise, the Court will use endnotes to reference the date entries. The endnotes are appended to the end of the opinion.

H & D already reduced its fees billed and requested a lower amount. Where the Court finds it appropriate to reduce the fees in a particular category, it will apply the reduction to the total fees billed. That method should avoid a penalty to H & D if their own reduction took into account that which the Court found to be problematic.

1. 4000.1 and 4000.4 <u>General and Administrative Matters and Creditors' Committee.</u>

| | Billed |
|---|---|
| FEES: | $154,635.75[5] |
| COSTS: | 13,389.94 |
| HOURS EXPENDED: | 1,402.95 |

■ H & D's Final Fee Application states that the fees in this category are attributable to advice concerning specific bankruptcy matters such as ordinary course business transactions and advice with regard to day-to-day corporate matters. The fees billed in the 4000.4 account arose from the role which H & D played as liaison to the Creditors' Committee. H & D maintains that the time was spent communicating with Committee counsel, members of the debtor, creditors and attorneys regarding progress of the estate, the bar date and other matters regarding claims against the estate.

In evaluating the fees charged to this account, the Court is mindful of the fact that there are separate account categories for matters that are part of administration of the estate, i.e., sales of specific assets, responses to motions for relief from stay (litigation), claims resolution, including reclamation claims, and other claims against the estate. In addition, since the debtor ceased operating within sixty (60) days of the filing, there should not be any fees charged for advice concerning "ordinary course of business" transactions after that date. Thus, the Court must assume that 4000.1 is a "catch-all" category primarily for services which related to preparing the statements of affairs and schedules, phone calls to or from creditors or members, the day-to-day corporate matters and communication with the client, presumably about the foregoing.

The initial level review of the billing statements reveal a number of problems. The Court observed the following: duplication of effort[6]; either no or inadequate descriptions of services provided; services lumped together without time allotted to a specific task[7]; and tasks improperly delegated. Examples of duplication of billings occur on October 13 and October 14, 1986. ACS, Allen W. Staver (AWS) and Michael W. Lillie (MWL) bill the estate for attending a meeting with the same officers regarding *inter alia* schedule preparation. Also, in 4000.4 on February 19, 1987, both ACS and SLL bill the estate 6.0 and 4.0, respectively, for attending the Section 341 meeting. On October 14, 1986, Charles H. Seeliger (CHS), Walter L. Palmer (WLP), and MWL attended the same meeting with members to discuss the Chapter 11 filing.

5. Of that amount, $120,539.25 is attributable to the "general and administrative matters," 4000.1, and $34,096.50 are attributable to Creditors' Committee's activities, 4000.4.

6. *See* 4000.1 on 6/9/87, 6/17/87 (all attorneys billing attendance at same meeting). *See also* 4000–1 3/18/87; 4000–2 10/13 and 10/14, 10/15/86, 11/21/86, 6/17/87 and 6/18/87. Attorneys have also duplicated effort in research and drafting. *See* 4000–1, 6/9 and 6/10/87, two attorneys have done research on the obligations of officers and directors in Chapter 7. *See also* cost center 4000–8A, 11/3, 10 and 19, 1986, Michael W. Lillie (MWL) spends 1.1 hours drafting a Section 363 motion. He subsequently spends 1.3 hours revising that motion and then he bills 1.1 hours for "bankruptcy issues regarding Super Value sale and Rule 363." On 12/5/86, Andrew C. Snyder (ACS) spends 2.3 hours editing and revising a draft of the motion to approve asset sale to Super Value. On 12/17 and 18, 1986, Gregory T. Jaeger (GTJ) spends a total of 8.7 hours researching a Section 363 sale and drafting an outline.

7. *See* 4000–1 on 4/1, 4/28, and 4/30/87, 5/12, 5/14, 5/15, 5/18, and 5/19/87, there are a number of entries where services are lumped together without allocation of time to specific items.

They billed 7.0, 4.5 and 1.9 hours respectively.

■ Additionally, a paralegal, Jackie Goodman (JG), has billed a substantial amount of time in this case, a significant portion of which was spent on secretarial or clerical types of services. Specifically, JG has billed for indexing pleadings, sending telecopies, responding to requests for copies of pleadings and calls to the court.[8] While the Court appreciates that firms may use paralegals in such capacity, this is not a practice which the Court can countenance by allowing the estate to pay the fees when the tasks performed should properly be delegated to employees paid at a lesser rate.

■ In some of these entries it is clear that JG has billed for preparing pleadings and phone calls to creditors and assisting in the preparation of the statement of affairs and schedules. These are appropriately billed as paralegal time and will be allowed as such.

There are also instances where attorneys have billed their full hourly rate for tasks which should have been delegated to a paralegal or secretary.[9]

■ H & D, for whatever reason, does not appear to have used counsel most efficiently. Mr. Snyder is the attorney experienced in bankruptcy among the attorneys at H & D. He spent some of his time drafting applications to employ professionals, *see* billing entry on October, 23, 1986, while Mr. Lillie, the litigation partner, is conferring with a client regarding the schedules and Mr. Seeliger is attending a creditors' meeting. One can only presume that because Mr. Snyder is the most experienced bankruptcy counsel he would be able to counsel the debtor most efficiently. It is not to say that other counsel may not work with the debtor in these matters. Rather, they should not charge their full hourly rates since their experience in bankruptcy matters in not as extensive as in their own area of expertise. This is again some indication of a lack of proper delegation.

On October 20, 1986, there is what appears to be a prime example of an inappropriate delegation of duties. On that date, Mr. Seeliger who is reputed to be a corporate/cooperative law attorney, billed the debtor eight (8) hours apparently advising the debtor on various matters relating to Chapter 11 procedures. The billing entries for October 20, 1986 state as follows:

> Conference with G. Gallus regarding Chapter 11 procedures; conference with P. Baron of Baron Export–Import, a creditor; conference with G. Raih of Arthur Anderson and Company regarding doing audit work for AG; conference with G. Hageman regarding how to file schedules in Chapter 11; conference *at* AG with G. Gallus regarding plan of reorganization (emphasis added).

There is no indication of how much time is spent on each item and the explanations are clearly inadequate. In fact, the foregoing entry is typical of most of the CHS billing entries.

Finally, the most striking problem is the inadequate or complete lack of explanation of some of the line entries.[10] The Court recognizes the practical realities of keeping time particularly in the early part of a case where there is a flurry of activity. That however cannot explain away the frequency with which the problem surfaces, nor does it override the need for providing suf-

---

**8.** *See* 4000–1 on 10/16, 10/17, 10/20, 10/23, 10/24, 10/29, 10/30, 11/03, 11/06, 11/13, 11/17, 11/20, 11/23, 11/26, and 12/15/86.

**9.** *See* 4000–1 on 11/3, 11/4, 11/5, 11/19/86 (CHS entries) and 12/08/86.

**10.** *See* 4000.1 on 10/13; 10/14; 10/15 ("research read for Board approval" .5 ML), (RLT entries); 10/17 (RAG entry for interoffice conference with MWL); 10/20 (JG entry); 10/21 (CHS entries; "legal work on . . ."); 10/28 ("Review all documents and notes" 3.3 KLB);

10/30/86 (ACS, CHS and MWL entries); 10/31/86 (ACS entries); 11/03 ("billing cont." [1.0] ACS); 11/07 (SLL entry); 11/11 ("Cont. U/C. Selliger" 1.0 ACS); 11/12 (ACS entry "attend Staff Meeting With Dept. Heads regarding procedures" 1.9); 11/13/86 (CHS entry "cont. with Vicki at G/C Financial Corp." .5); 11/19; 11/26/86 (JG entry); 12/01/86 (CHS entry); 12/03/86 (DLH entry "Research and review of A.G. leases; telephone conferences re: A.G. proofs of claim and rejection of executed (*sic*) contracts;" 5.0), 12/15/86 (ACS entries).

ficient information to enable the Court or client to evaluate the services being charged.

 The second tier review of the billing statements (evaluating the time spent on a particular task) reveals a number of instances where attorneys have spent or billed too much time for the task performed.[11] For example, on October 16, 1986 CHS billed *10.9* hours for:

> Conference with D. Snodgrass, atty. for Furr Foods regarding creditor status; conference with B. New, atty. for Entré Computer regarding claim; conf. with B. Hackworth regarding leases on autos by A.G.; conf. with P. Steahlin regarding payment by A.G.; conference with G. Hageman regarding wire. transfer of funds to post-petition vendors.

This entry presents two problems: (1) except in unusual circumstances it is not realistic for an attorney to bill in excess of six to seven hours per day. *Ramos v. Lamm,* 713 F.2d 546, 553 (10th Cir.1983); and (2) even if those circumstances are present because it is the early part of the case or otherwise, there is not enough explanation in either the billing entries or the narrative of the Application to justify billing the estate almost 11 hours for five conferences. Furthermore, because the time spent on each conference is not broken out, the Court cannot determine if the time spent at each one was necessary or reasonable.

As to the third tier (the results obtained), it is difficult to evaluate the results of the efforts put forth and billed to these sections because of their "catch-all" nature. Certain of the work performed, preparation of the statements and schedules, advising the debtor about ordinary course of business transactions and communication liaison, achieve results to the extent performed properly. Although those are nec-

essary and proper services, it is difficult to measure the results in this case.

In addition, the reasons for creating 4000.4 as a separate category escape the Court. That category includes time spent attending creditors' meetings, communications regarding the debtor's monthly reporting affidavits, the "Sinton sale," the contract for Super Value sale, United Bank motion for relief from stay, and the Creditors' Committee's fee application. Most of these areas are referenced in the 4000.1 billing entries or have their own account category.

In summary, the Court finds that it is appropriate to reduce the fees in these categories based upon the ample evidence of duplication, excessive billing practices, inappropriate delegation of services, and inadequate explanation for the services billed. The Court has focused on the period covered by the First Fee Application and drawn the support for its comments from those billing entries. This period was chosen for support because over half the fees attributable to these categories were incurred in that period. As discussed above, this is a difficult process and the Court must in some reasonable fashion confine its review but extrapolate from what it finds to make overall conclusions.

Accordingly, the Court concludes that a 30 percent reduction of the amount *billed* is appropriate. The total fees billed in connection with these matters, $154,635.75, shall be reduced by 30 percent and H & D is allowed fees in the amount of $108,-245.02 for categories 4000.1 and .4.

Due to H & D's inclusion of non-compensable cost items, there should be a reduction in the expenses requested of $13,-389.94. The following reductions should be made for items which are not compensable: $90 for telecopies, $107.45 for delivery or courier services, $21.50 for Federal Ex-

---

11. *See* 4000.1 on 10/18/86 (ACS "Draft application for Ext. of Time regarding Schedules & Order" 1.0); 10/23 (ACS "Draft Application to Employ CPA's" (1.0)); 10/30 (CHS entry 4.0); 11/05/86 (ACS "Review pleadings, motions and orders" 3.0) and (CHS "send release signed by G. Gallus to B. Cheney to obtain insurance proceeds on Albuquerque roof 1.0 prepare 2 sets of

corporate minutes of A.G. directors' meetings; conference with K. Thaxton" 3.0); 12/02/86 (ACS "Edit and Revise Combined Notice and Reviewed Motion; phone conf. with S. Snyder regarding same" 2.6). *See* 4000.4: 2/4/87 (CHS "assemble information to send to S. Seifert re: Rodney Love" 1.0).

press or express mail, $93.75 for overtime, and $295.53 for ACS's car phone expenses. Hence, H & D is awarded $12,781.71 in costs for these account categories.

2. Sale of Aurora Warehouse 4000.8A

| | Billed |
|---|---|
| FEES: | $53,634.00 |
| EXPENSES: | 1,149.62 |
| HOURS EXPENDED: | 390.55 |

 AG's primary asset was its 60 percent interest in the AG–Opus Joint Venture (Joint Venture), a general partnership which owned a state-of-the-art distribution warehouse in Aurora. AG leased the land and the improvements from the Joint Venture. The Joint Venture negotiated a contract for the sale of the warehouse to Super Valu Stores with a sale price of $31.5 million. Super Valu also purchased inventory at the warehouse for approximately $4.5 million.

The first fee application states that the fees requested in this category were incurred in connection with the negotiation and sale of the warehouse and inventory and in negotiations to terminate the existing lease and enter into a settlement with respect to sale proceeds. The Applicant describes the benefit of these services in its fee applications as the net proceeds of the sale in excess of $6 million which was paid to United Bank of Denver in partial satisfaction of its secured debt. CHS and WLP spent the majority of time negotiating the sale; they were assisted by litigation and bankruptcy counsel in preparing the sale documents.

This Court has reviewed the billing statements for this 4000.8A category and finds that the explanations are inadequate. For example, on October 13 and 14, 1986, MWL billed the debtor a total of three hours for conferences with the officers of the debtor regarding "Wetterau, Super Valu and other proposals."

It is apparent that services have been duplicated[12] and tasks improperly delegated. There is also a duplication of research, probably due to lack of organization. For instance, there was a great deal of duplication on the Section 363 issue. On October 25, 1986, MWL billed 1.6 hours to research the debtor's right to sell assets pursuant to 363 as opposed to under a plan. On December 17 and December 18, 1986, Gregory T. Jaeger (GTJ) billed the estate a total of 8.75 hours for research on a Section 363 sale and drafting an outline thereof. On November 3, 1986, MWL billed 1.1 hours to draft Section 363 motion, and on December 3 and 4, 1986, ACS billed the estate 5.8 hours and 3.2 hours, respectively for, *inter alia*, drafting several revisions of the motion to shorten notice and form of combined notice of sale and drafting the motion and proposed order to approve a sale to Super Valu.[13]

In the introduction the Court made reference to excessive billing practice by one attorney in particular. That attorney, CHS, alone billed $19,695 during this first period in which a total of $53,131.50 was billed. Thus, comment on CHS's "aggressive billing practices" is appropriate at this point. CHS has a practice of billing a minimum of .5.[14] On occasion he only charges .25 for barely described conferences. On November 14, 1986, CHS billed 4.5 hours, three of which are attributable to "work on Opus proposal." No other explanation is provided. On November 26, 1986, CHS billed nine hours total, 7.5 of

---

**12.** *See* 4000.8A on 10/23 and 10/24/86, both MWL and CHS bill a total of 9.75 hours for conferences with the officers of AG in preparation for and attending a meeting. On 12/4/86, both CHS and WLP bill apparently four hours for a conference at the offices of Davis, Graham & Stubbs for signing the acquisition agreement. On 12/19/86 GWB, MWL and DLH appear to bill the same G. Hageman deposition with MWL and DLH billing for the same conference for total of 15.3 hours. On 12/23/86, both ACS and MWL bill a total of 15.4 hours in preparation for the sale hearing and attending that hearing. Both CHS and WLP attend the closing

of the sale in Minneapolis on 1/9/87 and each charges 13 hours of time.

**13.** The time for ACS's December 3, 1986 entry is not broken out nor are the services performed explained sufficiently. Moreover, the Court cannot see how a motion to shorten notice could consume 5.8 hours.

**14.** *See* 4000.8A on 10/27, 10/29, 11/10, 11/11, 11/12, 11/24, 11/26, 11/28, 12/9, 12/10, 12/15, 12/16, 12/19, 12/22 and 1/26/87, etc.

which is attributable to "work on reviewing Super Valu contract including equipment and inventory contract" and 1.0 which is billed for "work on Hart–Scott–Rodino document." Given his apparent propensity for excessive billing, the Court is suspect of his billing nine hours in a day. On December 10, 1986, CHS billed for services nebulously described as "work on obtaining documents" and charges the estate three hours. Equally nebulous is his entry on December 17, 1986 where he billed three hours for "obtaining documents for G. Gallus deposition." On its face this appears to be a purely clerical function but there is insufficient information to evaluate it. On December 19, 1986, CHS billed the client .5 to "send revised inventory contract to J. Strom." Without other explanation, that also appears to be purely a clerical task and not something for which attorney time should be billed.

The Court could go on and on pointing out these types of problems, but it will not. Instead, these examples are sufficient to demonstrate what occurs throughout.

With respect to the second tier of this review, the time spent per task, the Court has commented on CHS's time and ACS's work on the combined notice and motion. Because of the inadequacy of many of the entries, it is very difficult to determine whether the time expended is excessive.

The third tier, the results achieved, must now be analyzed. H & D's role was not primary due to the nature of the debtor's interest in the sale of the warehouse. The debtor was not the seller, its concerns were a leasehold interest and a partnership interest, albeit 60 percent, in the AG–Opus Joint Venture which owned the warehouse. The secured lender, United Bank of Denver (UBD), held a lien on that partnership interest so the entire proceeds of the sale attributable to the partnership interest, $6 million, were paid to UBD in *partial* satisfaction of its debt. There was no excess to go to unsecured creditors although they did receive some benefit as the deficiency owed to UBD was reduced. However, there is no substantive information in any of the papers filed by Applicant to quantify how

the legal fees expended in this category actually benefitted the estate, not just the secured lender or the Joint Venture; or whether the Joint Venture shared in these expenses and, if so, to what extent.

Moreover, H & D states that a portion of fees were expended "negotiating to terminate the lease" with the Joint Venture. The Court questions the need for any extended negotiations considering AG's majority ownership in the Joint Venture, the availability of Section 365 to a debtor and the ease with which the debtor can invoke that section. Once again there is no explanation to dispel the Court's concerns.

The Court finds that it is appropriate to reduce the fees charged for this category due to the inadequate billing statements, duplication, excessive billing and failure to demonstrate a benefit to the estate. Accordingly, the fees of H & D shall be reduced by 40 percent and allowed in the amount of $32,180.40.

■ With respect to the expenses requested, there is no itemization for $175.29 in expenses charged in the first fee application under this (or the 4000.8) category. The Second Fee Application includes an itemization of $975.33 in expenses. A majority of that was incurred by CHS and WLP on the overnight trip to Minnesota for the closing. One line item is for Mr. Seeliger's hotel in the amount of $409.21. Without further explanation this Court fails to see the necessity or reasonableness of a $409 hotel bill for one night in Minneapolis, Minnesota, and thus will disallow this fee except for $100. Accordingly, H & D will be allowed expenses in the total amount of $666.12 for the period covered by the second fee application for total expenses of $841.41.

3. Sinton Food Companies (4000.7)

| | Billed |
|---|---|
| FEES: | $115,370.60 |
| EXPENSES: | 3,173.73 |
| HOURS EXPENDED: | 983.8 |

■ AG owned 92 percent of the stock of Sinton Food Companies, Inc. (Sinton). H & D on behalf of the debtor negotiated the sale of the assets of Sinton including its subsidiary and 49 percent stock ownership

in another company to Steffen Dairy in the spring of 1987. Sinton is now in the process of liquidation and the net proceeds of that liquidation, approximately $3.2 million, will go to the debtor.

The Committee objected to these fees because the original contract for sale never closed. Also, Sinton incurred an additional $1 million in debt between the time the purchase and sale agreement was executed and the closing date. Additionally, the contract for purchase had been assigned to a new entity which was partially controlled by insiders of Sinton.

The obvious concern is that there were no provisions in the contracts for sale to prevent Sinton from incurring additional debt or the assignment of the contract, yet, the documents were drafted in part and reviewed in detail by H & D. As a result, the proceeds of the sale were diminished by that amount and further costs were incurred to bring the deal to closing. The Creditors' Committee makes the objection that the minority shareholder did not share in the costs of sale, including attorneys' fees, and should have.

As for the first level of analysis, the billing records reveal a substantial number of entries by both CHS and WLP that suffer the same inadequacies described in the earlier part of this opinion. Mr. Seeli-

ger's propensity for billing .5 for conferences, whether phone or otherwise, is notable on October 23, 1986 and November 20, 1986 (only two entries were billed for any lesser time). It is not clear from the entries what the various conferences were for or the nature and extent of the legal advice or service rendered. Because Mr. Seeliger billed .5 so frequently, this Court doubts that amount is an accurate reflection of time spent.

■ Duplication of effort and double-billing of services is glaring in this section. Both WLP and CHS, whose specialties are essentially the same, attended a number of the same meetings.[15] On December 5, 1986 and December 22, 1986 it appears that each conferred with the same person simultaneously or at separate times. Each has billed at their full hourly rate of $155 and $150 per hour, respectively. The estate should not pay for such duplication of services where there is no indication why the services of two attorneys were necessary.

■ True to form CHS rather consistently billed substantial hours of time and performed tasks, at least by his description, that appear to be tasks which could be performed by someone at a lower hourly rate or possibly by a paralegal or secretary.[16] For example, on December 8, 1986,

---

**15.** This double-billing is apparent on 10/28/86 when both CHS and WLP billed six hours to the estate for attending a meeting in Colorado Springs; *see also* 11/17/86, 11/18/86, 11/24/86, 11/25/86, and 11/26/86, etc.

**16.** Examples of his 4000.7 billing entries are as follows:

| | | |
|---|---|---|
| 03/19/87 | work on legal description for Sinton Sale | CHS 3.0 |
| 03/23/87 | conference with Jeanne at Land Title regarding title insurance (1.5); prepare letters sending information to Land Title on all three properties (1.0); work on title information for obtaining commitment (4.0); conference with J. Medved regarding Sinton closing (.5); conference with K Beaver re Sinton closing (.5); prepare for closing; work on all documents (4.0); | CHS 11.50 |
| 03/25/87 | conference with Jeannie at Land Title regarding title insurance (.5); conference with J. Holland of Arthur Anderson regarding financial statements (1.0); title work and preparation of closing documents (3.0) | CHS 4.50 |
| 03/30/87 | three conferences w/L. Losasso and G. Hageman re financial info. (3.0); conf. w/J. Medved re fin. info. and effective time for closing (.5); determination of effective time, change of name, payoff statements, assignments, resolution (7.0); conferences w/G. Hageman and L Losasso re closing date (.5); send new title commitment to J. Medved with cover letter (1.0); conferences re title insurance (1.0); conf. w/J. Medved re closing procedure (1.5); cf. w/B. Cusworth re closing (.5); | CHS 15.00 |

Mr. Seeliger billed the estate one hour to "obtain copies of Watts–Hardy Contract of Purchase and Sinton Contract of Purchase for J. Collins for Seibert, Seidman and Seidman." He also billed the estate .5 for a cover letter to K.B. Beaver sending a copy of Longmont lease and bankruptcy notice. Again on January 14, 1987, Mr. Seeliger "send(s) schedules of contract to L. Lasasso with cover letter" and billed .5. The entries sound like the typical "enclosed please find the enclosed enclosure" letter. This is purely clerical and hardly worth $75 to the estate. The effect of this type of entry, however, is to reinforce the Court's conclusion that CHS typically "aggressively bills."

Finally, there seems to be extraordinary amounts of time charged due to multiple attorney involvement. The total attorney time billed for April 2, 1987 is 17.6 hours, a portion of which appears to be duplicate effort by CHS and DLH. On April 3, 1987 three attorneys billed the estate a total of 19.25 hours, once again without allocating a specific time next to each entry. The exception to this are the entries for Kevin L. Brown (KLB) which contain some inadequacies but are generally sufficient.

On April 6, 1987 five attorneys billed the estate a total of 32.3 hours for various services in connection with the closing, the majority of which appears duplicative. The next day, April 7th, six different attorneys bill a total of 26.6 hours preparing for the closing which was canceled. Thereafter WLP comes back into the picture to review the Sinton sale documents and bills the estate 1.5 hours time for that review.[17] By this time litigation counsel had been called in to review the sale documents and prepare the necessary injunction pleadings.[18]

As for the third level of analysis, the results obtained, the Court must concur with the concerns expressed by the Creditors' Committee. Although the sale netted $3.2 million to AG, a greater amount would have resulted had a clause been incorporated into the purchase and sale agreement prohibiting the incurring of additional debt. Additional expense was incurred renegotiating the sale and reaching the closing table. Despite all the time expended by H & D counsel, no such provision was included and could have been. Admittedly, it is easy to see these things more clearly in retrospect, however, the estate and its creditors should not bear the entire burden of this oversight.

In sum, the Court concludes that in this account category it is appropriate to reduce the total hours billed by 40 percent "across-the-board" to account for the inadequate explanation, duplication of services, multiple attorneys, the aborted closing and the additional and unnecessary work attributable, in part, to poor drafting on the part of H & D. Thus, H & D will be allowed fees in the amount of $69,222.36 or 60 percent of the $115,370.60 requested.

H & D has requested expenses in the amount of $3,173.73. There is no doubt that the aborted closing contributed to higher costs. Had the first closing occurred as scheduled, additional copies, etc., would have been unnecessary. Further-

| 04/01/87 | work on closing documents, assignment of trade names and trademarks, assignment of corporate name, amendments to articles of incorporation; obtain consent of United Bank, prepare Bressler assignments (10.0); conf. with Gina at Land Title re title insurance and lien affidavits (.5); conference w/W. Hoecker re closing (1.5); conference w/D. Loos re real estate title matters (.5); | CHS 12.50 |
| 04/01/87 | Conference with A. Blair regarding ... | CS 3.50 |
| 04/02/87 | ... prepare closing documents, payoff statements, and Bressler consents and assignments (8.5). | CHS 10.00 |

17. *See* 4000.7 entry on 4/15/87.

18. *See* 4000.7 entries from 4/9/87 to 4/15/87.

more, the itemizations indicate that a number of the changes are for hand deliveries, telecopies, Federal Express deliveries, computer time and overtime recovery without any explanation of why such charges were necessary. Thus, the following charges will not be allowed: $112 for the use of Federal Express, $129 for the use of telecopies, $77.52 for the use of hand delivery or courier services, $79.69 for computer time, and $45 for an overtime entry. Accordingly, H & D is allowed $2,730.52 of the $3,171.73 in costs requested.

### 4. Sax Stores (4000.8B)

| | Billed |
|---|---|
| FEES: | $120,316.50 |
| EXPENSES: | 2,584.72 |
| HOURS EXPENDED: | 1,162.4 |

■ Kevin L. Brown's Direct Testimony Affidavit, describes that the debtor was obligated under certain real and personal property leases for supermarkets known as Sax Food Stores No. 201, No. 301 and No. 401 ("201," "301," "401"). These were large, warehouse-type grocery stores. The debtor leased the real property, then sublet it to the store owners, and provided financial incentives and loans for the construction of the stores and the acquisition of inventory. AG also guaranteed various obligations of the stores' owners. The disclosure statement filed by the Creditors' Committee and the Final Fee Application assert that the potential liability of the debtor under these leases and guarantees was greater than $28 million.[19]

H & D describes that they assisted the debtor in negotiating sales of these stores; obtaining releases of those potential liabilities; and collecting loans and accounts receivable from the store owners. The net result was that AG collected $1.3 million from the store owners and it holds an unsecured claim of $1.2 million against the KJS estate[20] (pursuant to the Disclosure Statement, it expects to realize 5–10 percent of the amount of that claim), and substantially reduced the amount of unsecured debt.

In its objection the Creditors' Committee acknowledged that the sale of these three stores represented one of the most complicated issues in the case because of the debtor's roles as lessee, sublessor and guarantor of various store debts. However, the Committee, which was involved in the sale and lease negotiations asserted that H & D delayed in negotiating with the lessors and in responding to various settlement proposals resulting in an administrative expense claim.

At the final fee application hearing, H & D responded to that assertion by noting that the sale of these stores did not lend to piecemeal settlement because of the interrelationship of the parties. But instead, H & D contended that they were making efforts toward a global resolution. H & D asserts that had they isolated one of the administrative claimants and settled it on its own, they might have run the risk of jeopardizing the entire sale, thereby triggering liability on all of the leases and guarantee obligations.

In considering the fees of H & D in this instance, the Court must consider that H & D's role was somewhat ancillary. They assisted in the negotiations and prepared legal documentation, but the debtor was the sub-lessor and not the owner of the property. With respect to the 301 and 401 stores, their ancillary role is more evident because the Creditors' Committee was involved.

The billing records and the fee application indicate that 10 different attorneys took some part in these transactions. The billing entries for this period are inadequate for the reasons described in the Court's general comments at the outset of this opinion and throughout.[21] The billing entries are lumped together without a specific amount of time allotted to each and are extremely vague. These comments go especially to the entries of AWS.

---

**19.** As lessee, AG was entitled to limit the damages for a breach of a lease as set forth in 11 U.S.C. § 502(b)(6). The Court does not know whether this amount takes into account the limitation on damages.

**20.** KJS, the owner of the 301 store, also filed a Chapter 11 petition.

**21.** *See* 4000.8B AWS entries on 10/15, 10/20, 10/21 and 10/27/86.

Kevin Brown has billed the greatest amount of time in this category. Generally his time appears to be sufficiently accounted for and duplication does not seem to be as significant a problem as it has been in the other categories despite the number of attorneys involved.

During the period covered by the Second Fee Application, however, CHS became more involved and thus duplication becomes apparent. On March 18, 1987, both he and KLB bill time for a conference with G. Hageman regarding the 301 negotiations. Duplication is also notable on March 26, 1987.

The Committee has recommended that the Court reduce the fees requested by an additional $13,000. The Court has considered H & D's response at the hearing to the Creditors' Committee's objection regarding H & D's delay, the Creditors' Committee's participation in the negotiations, the problems with the billing entries and, finally, the impact on the unsecured creditors by reducing unsecured claims. Having done so the Court concludes that an overall reduction of 20 percent of the fees billed is appropriate. Accordingly, H & D is allowed fees in the amount of $96,253.20 out of $120,316.50 billed.

As for expenses, there should be a reduction for non-compensable items and those items which require special justification. The following should be deducted from the expenses awarded in this category: $137 for the use of Federal Express or express mail services, $251.55 for the use of delivery or courier services, $35 for overtime recovery, $72 for the use of telecopy services, and $111.74 for the use of computer research. Thus, H & D is allowed costs in the amount of $1,977.43 out of $2,584.72 requested.

5. Sale of Subsidiaries and Other Assets (4000.8 and 4000.8C–F

| | Billed |
| --- | --- |
| C–F FEES: | $17,948.50 |
| EXPENSES: | 31.20 |
| HOURS EXPENDED: | 184.6 |
| | |
| .8 FEES: | $72,654.25 |
| EXPENSES: | 6,211.09 |
| HOURS EXPENDED: | 633.50 |

H & D represented AG in the negotiations with purchasers for the sale of four subsidiaries, Grocers Insurance Services, Inc. (4000.8C), Grocers Loan Company (4000.8D), A.G. Investment Company (4000.8E) and Associated Capital Corporation (4000.8F). H & D also assisted with the negotiations and documentation of sale of miscellaneous assets, including equipment, vehicles and other personalty from the Aurora warehouse at auction, a warehouse in Pueblo, inventory and fixtures, various trademarks, signs and other miscellaneous assets (4000.8).

The Creditors' Committee objected to CHS's time billed during the period covered by the Fourth Fee Application on the grounds that CHS had some prior relationship with Lou Carey, the original prospective purchaser of the subsidiaries. A sale had been negotiated with Mr. Carey for $1.7 million, the Creditors' Committee objected and the sale price was renegotiated at $2.45 million. In response to the Creditors' Committee's objection, H & D deleted Mr. Seeliger's time during that period. The Creditors' Committee has not interposed any further objections to the fees requested by H & D in either of these sections.

■ The Creditors' Committee alleged that CHS represented either Mr. Carey or one of the subsidiaries which he purchased. Without directly addressing the conflict raised, the facts speak for themselves. The first offer which AG had accepted from Lou Carey was for a guaranteed sale price of $1.7 million. Ultimately the sale price was increased to $2.45 million. Hence, Mr. Seeliger's time in negotiating the first sale should not be charged. It was of no benefit to the estate because the sale was to be renegotiated at a significantly higher price.

■ As for the first level of review, the same obvious problems exist which were present in the other account categories. There is duplication, inadequate or no explanation for telephone calls and confer-

ences, many of which are billed at .5. Services are lumped together so that the Court cannot determine either how much time was spent on a particular task or evaluate whether the time spent is reasonable.

As for the reasonableness of the time spent in these categories, the Court observes that the billing statements for this category are particularly blurred. Hence, the Court had difficulty determining the amount of time spent on each asset sale.

During the period covered by the first fee application,[22] H & D billed the debtor $30,128.25, approximately 30 percent of which is CHS's time. During the period covered by the Fourth Fee Application when the sale was renegotiated and all of Mr. Seeliger's time deleted, H & D billed the debtor approximately $29,000. In the Fourth Fee Application, a majority of that time was spent providing services for the sale of the stock of the subsidiaries. Curiously, some of that time is billed in the 4000.8 cost center despite the presence of separate cost centers. The closing occurred during the period covered by the Fifth Fee Application so additional fees of approximately $10,000 are requested. While H & D magnanimously deletes all of Mr. Seeliger's time for the period covered by the Fourth Fee Application, it bills the estate for all of Mr. Seeliger's earlier time.

Furthermore, in reviewing the billing statements supporting the Fourth Fee Application for the 4000.8C–F account categories, it became apparent that Mr. Seeliger billed each account the full time for precisely the same work. He merely changed the reference name, charged the time, but did not divide his time among the cost centers. Thus, there appears to be some "bill padding." There is at least one instance of that in the period covered by the Second Fee Application.[23] It is noteworthy that H & D deleted the CHS fees in that Fourth Fee Application period, but it did so *only* in response to the specific objection of the Creditors' Committee. Notwithstanding that "voluntary" reduction, the Court is offended by such billing practices and it provides further evidence to this Court of Mr. Seeliger's abusive pattern of billing the estate.

As for the third level of review (the result and benefit to the estate), H & D summarily describes the benefit to the estate by stating the amount of the sale proceeds. This does not tell the Court anything since there is no real indication of the value of the various assets which were sold. The only sense that the Court gets about assets' potential value comes from Andrew Snyder's direct testimony affidavit. He states that two of the subsidiaries were virtually debt free and the third, Associated Capital Corporation owed approximately $1.75 million to the Small Business Administration. Notwithstanding that information, it is difficult for the Court to discern how much the sale benefitted the debtor.

Rather than deduct a percentage for these inadequacies, the Court concludes it will deduct Mr. Seeliger's time for the time spent on these categories in earlier fee applications up to and including the Fourth Fee Application. This reduction not only sufficiently recognizes the inadequacies of the applications (generally, Mr. Seelinger's time entries were the least complete), but it also acknowledges the minuscule benefit realized by Mr. Seeliger's efforts towards the first asset sale.

Accordingly, the fees billed shall be reduced by $30,727.50 and H & D will be allowed total fees for sales of the subsidiaries and other miscellaneous assets in the amount of $59,875.25 out of the $90,602.75 billed.

With respect to the expenses incurred in connection with the sale of assets, the Final Fee Application narrative requests $6,241.40.[24] This includes the "duplicate

---

**22.** At that time there was only one cost center into which all fees related to sales of these and other assets were placed.

**23.** *See* 5/11/87 entries in 4000.8C and D.

**24.** The aggregate of the expenses taken from Exhibit A for 4000.800(.8), 4000.803(.8C), 4000.-804(.8D), 4000.805(.8E); and 4000.806(.8F) is $6,242.29. The expenses as set forth therein and as broken down do not reconcile with the expenses requested in the narrative. This sug-

charges" due to the renegotiation of the sale following the Creditor's Committee objection. In addition, H & D requests compensation for costs which are non-compensable in the following amounts: $160 for sending telecopies, $360.35 for delivery or courier charges, $52 for Federal Express or express mail, and $121.50 for overtime recovery. Accordingly, H & D will be allowed expenses in the amount of $5,547.55 for these account categories.

### 6. Debt/Equity (4000.12Z)

| | Billed |
| --- | --- |
| FEES: | $40,041.00 |
| EXPENSES: | 11,779.27 |
| HOURS EXPENDED: | 583.38 |

 It has been universally recognized that the cooperative structure of Associated Grocers was the source of one of the most significant and pervasive problems in the case—the debt/equity issue. The member grocers who held certificates of stock representing their distributions from the profits and deposits had more than $25 million in various accounts. The precise nature of these funds was uncertain throughout the case and impacted the reclamation claims, specifically the solvency issue, collection of accounts receivable, and the issue of the right of setoff. H & D first initiated a motion to determine the rights of the members and subsequently filed an adversary proceeding for that purpose. Thereafter the debtor played only a discovery role.

H & D argued that the research which it performed and the lawsuit which it initiated were the catalysts which allowed the trade creditors and members to resolve the issue. The Applicant stated in its Final Fee Application that "the pendency of the lawsuit helped to end the stalemate and motivated the various factions to formulate a settlement which was eventually incorporated in the Committee plan." In her Direct Testimony Affidavit, Ms. Linsley testified that neither the debtor nor H & D had a continuing role in the proceeding, apart

from the service of defendants and assistance with discovery.

In the Third Fee Application, the direct testimony affidavits, and the argument presented at the hearing on the Final Fee Application, Ms. Linsley maintained that there was very little to do to the substance of the complaint that was filed because it was the same as the motion in essence, and because the position of the debtor as a stakeholder remained unchanged. She asserted that the relief sought, a determination of the nature of the members' interest, was the same regardless of the procedural vehicle used. She noted that the critical factor was the issue of service of the complaint.

The Creditors' Committee objected to the request for fees in the Final Fee Application on the grounds that H & D did not institute the litigation in a prudent manner. The Creditors' Committee pointed to the fact that H & D first attempted to resolve this classification dispute by motion. H & D instituted an adversary proceeding only after the instruction of the Court to do so. This delay, the Committee argued, resulted in a delay of distribution to the creditors. It also objected to the research done by H & D once the litigation was initiated insofar as research was better left to the groups of defendants in the lawsuit and thus H & D's research was unwarranted. The Committee believes that an additional reduction of 10 percent, or $3,800, is warranted.

This Court has considered the roles of the various parties to this litigation and the benefit each provided the estate in the context of the applications pursuant to 11 U.S.C. § 503(b)(3) and (4) of the Bettale Group of member grocers, Yob Investment Company and Skaggs Alpha Beta, Inc. (Section 503 Applicants). On October 17, 1986 the Court issued an Opinion and Order on the request of those creditors for compensation. In that opinion the Court observes "although the debtor filed the adversary, the debtor was really nothing more than a stakeholder for a limited

---

gests that these "account categories" are quite amorphous and that H & D has arbitrarily assigned costs to a particular account category to do so. Moreover, the exact amount of expenses

requested, $514.79, correlates on Exhibit A to the 4000.900(.9) category rather than the 4000.8 categories as requested in the Final Fee Application.

amount of money. It was counsel for the trade creditors and member grocers who played the key role in prosecution and settlement of the adversary which contributed to the confirmation of the debtors' amended plan." *In re Associated Grocers of Colorado, Inc.*, 86 B 09650 C, slip op. at 9 (Bankr.D.Colo. Oct. 17, 1989). Thus, the Court concurs with the Creditors' Committee and finds that the debtor's role after the institution of the litigation was rather nominal.

It is important then to look at when and what fees were charged. The *subject motion* was filed in March, 1987, during the time covered by the Second Fee Application. H & D billed the estate $5,480.17 in fees and expenses. The *complaint* was filed on July 8, 1987, during the time covered by the Third Fee Application. H & D then expends $33,858.16 in fees and expenses. The Court marvels at this nearly six-fold increase in light of Ms. Linsley's statements that nothing further needed to be done to the substance of the complaint. Thereafter when all agree that the debtor was nothing but a stakeholder, H & D charges $17,862.11 in fees and expenses for the periods covered by the Fourth, Fifth and Sixth Fee Applications. The compromise, which was incorporated into the confirmed plan, was reached in early 1989.

The Court has reviewed the billing statements for this account category, but for the purposes of discussion, focuses on the period covered by the Third Fee Application when the highest fees were charged.

As for the first level of analysis, again there are problems with duplication and inadequate explanation by the attorneys. Specifically, there are entries of phone calls, in fact frequent entries of phone calls by SLL, which are completely unexplained.[25]

With respect to the second level of analysis, the time spent per task, the Court notes that the majority of fees have been charged by SLL who, at that point, had been licensed to practice law for less than a

year. SLL bills frequent conferences with DLH. These appear to be "associate support" type conferences indicative of SLL's inexperience. While that may be necessary for a new associate, the estate should not pay for that luxury regardless of whether DLH billed the same conference.

■ In surveying the types of entries recorded during this time period, a majority appear to be strictly clerical. SLL makes frequent entries for time spent proofing address labels, preparing the complaint and supervising the mailing. Her total time attributable to these types of entries is 46.5 hours. A paralegal spent time to prepare labels and the certified receipts for service and her time totals 118.5 hours. The Court recognizes that in order to insure proper service a certain amount of professional time may be necessary, but when such a substantial amount of time is charged it no longer is justifiable and appears to be *purely* clerical. As discussed above, although a law firm may choose to use paraprofessionals for such tasks, the estate should not be required to pay for the performance of clerical work by such professionals.

In reviewing the paralegal time charged one paralegal, MT, consistently billed eight hours per day preparing certified return receipts and processing the complaints for service. The inference is that this paralegal billed her entire day to this effort and did not log the actual time spent.

Finally, as for the result obtained or the benefit received, the Court finds that H & D's fees should be adjusted. The fees charged do not correspond to the narrative and testimony. They seem excessive in light of the limited role which H & D and the debtor played. Moreover, the fees requested for the periods covered by the Fourth, Fifth and Sixth Fee Applications appear to cover the time when the creditors who received Section 503 compensation had taken over the litigation. The Court recognizes, however, that once the lawsuit was initiated by the Debtor as plaintiff, it was

**25.** *See* 4000.12 on 5/19/87, SLL bills 1.3 hours for telephone calls to various people without any explanation for the call.

necessary that it respond to discovery and H & D should be allowed some fees for that effort.

Accordingly, H & D's fees shall be reduced by 20 percent for the period covered by the Second Fee Application and by 40 percent for the periods covered by the Third through Final Fee Applications. Thus, for the Second Fee Application the award is $4,330.40 out of $5,413 billed; the award for the other Applications is $20,776.80 out of $34,628 billed. H & D shall be allowed fees in the total amount of $25,107.20.

■ With respect to the expenses, H & D again has billed the estate for non-compensable costs. H & D included $52.60 for telecopies and $39.41 for Federal Express or express mail costs which are not allowed. There was also duplication of copying and mailing charges due to the overlap of serving certain defendants with both the motion and complaint. However, the Court is reluctant to disallow costs for those items due to the honest confusion about how to procedurally resolve the debt/equity problem. Accordingly, H & D's expense for this cost center shall be allowed in the total amount of $11,687.26 out of the $11,779.27 requested.

### 7. Accounts Receivable (4000.12) [26]

| | Billed |
|---|---|
| FEES: | $63,743.50 |
| EXPENSES: | 1,613.22 |
| HOURS EXPENDED: | 727.00 |

■ The fees billed to this account were incurred in connection with collection of approximately $20 million in accounts receivable. In the early part of the case H & D instituted a number of these actions as test cases to aid the debtor's reorganization efforts. No doubt prompt collection of accounts receivable was critical to that reorganization. Ms. Linsley testified in her affidavit:

> two significant legal considerations dominated the early collection efforts of these receivables. First there was a question

as to whether any of the members' ... investment in debtor could properly be offset against outstanding accounts and collaterally, how to obtain a determination of this issue in such a way as to minimize litigation costs.... Second, the law of this jurisdiction at the time of filing raised substantial doubt whether the bankruptcy court could or would take jurisdiction over suits in regard to the accounts on setoff.

Accordingly, the debtor initiated certain cases as "test cases." The debtor, however, very early on, made the decision not to reorganize and to liquidate.

It was well known to all parties that the members owing accounts to the debtor would attempt to offset their various investments in and claims against the debtor, an issue which would ultimately be resolved by the debt/equity litigation. According to the direct testimony affidavit of Susan Linsley, ultimately, their efforts to collect accounts receivables ceased because it was "preferable to have a uniform and binding determination of the debt/equity and offset issue."

The billing statements for the period covered by the First Fee Application demonstrate that H & D began to research the issues of offset, debt/equity and jurisdiction issues on October 17, 1986. By the close of the period covered by the First Fee Application, the debtor vacated the trial dates and pursued the debt/equity issue. As pointed out above, it was the filing of the adversary proceeding to determine the debt/equity controversy that prompted the global settlement which was incorporated into the Plan.

The Creditors' Committee originally objected to the large amount of fees because it held the view that H & D pursued the litigation longer than needed. Subsequently, the Committee withdrew its objection to these fees. According to the Committee's partial withdrawal of the objection, it withdrew because it was provided with informa-

---

**26.** As best this Court can discern, this category encompasses not only the .12 account category but all other .12 categories except .12Z covered above. The Court has concluded this by adding all fees and expenses for those categories from the first through final fee applications and arrived at the total requested by the debtor in its Final Fee Application.

tion by H & D "that the fees incurred in bringing the test cases was (sic) approximately $12,000 and that the balance of fees relate to other collection matters which, for the most part, were not affected by the debt/equity controversy and were successful to the extent of $1.5 million in collections." It is noteworthy that according to Ms. Linsley, more than $1,400,000 was collected *without litigation* from members on accounts.

As for the first level of analysis, this area is similar to the other account categories, it is if rife with problems of duplication and inadequate time entries. It is striking that in the billing statements attached to the First Fee Application, of 190 line entries, 50, or 26 percent, of those involve billings for conferences among the attorneys in the office.

As for the second level of review, the Court finds that the amount of time expended was not always reasonable. Eleven attorneys were involved in providing services relating to these "test cases." The greatest amounts charged are billed by DLH and SLL. SLL and DLH frequently conferred with each other.[27] In many cases both or all attorneys involved in particular conferences billed for their time.[28] For a number of these entries there is no explanation[29] and no indication as to how much time is spent in these intra-office conferences, yet substantial amounts of time are billed for that and other entries for the same line item.

While it appears that DLH graduated from law school in 1979, he was not licensed to practice in Colorado until 1982. Also, his billing rate is in line with SLL, a new associate. Accordingly, the Court must assume that DLH was new to bankruptcy. From the nature and number of the conferences that MWL had with SLL and DLH the Court safely infers that MWL supervised them and that was one purpose of these conferences. Notwithstanding that, it appears that there is a fair amount of "floundering,"[30] and a general lack of coordination.[31]

Finally, the Court will review the results obtained and benefit to the estate from the legal services rendered in connection with these test cases and the accounts receivable collection. Ms. Linsley mentions the recovery of $1.5 million without litigation, but that in and of itself does not justify fees in excess of $65,000. The First Fee Application states that H & D issued demand letters to all members with positive balances and that H & D advised the debtor's accounts receivable department regarding collection methods. Thus, if H & D expended only $12,000, as mentioned by the Creditors' Committee, on the "test cases", then the remaining $43,000 was spent on research and demand letters. That does not seem reasonable.

While the Court believes that some benefit was served by these suits, considering that the course of events changed in the

---

**27.** *See* 4000.12Z on 11/14, 11/18, 11/19, 11/20, 11/24, 11/25, 12/1, and 12/31/86, and 1/14, 2/2, and 1/28/87.

**28.** On November 19, 1986, Ms. Linsley bills the estate 1.5 hours for "meeting with R. Thorgren, D. Honeck and M. Lillie regarding accounts receivable and discuss complaint with D. Honeck; on that same day Mr. Honeck bills the estate 5.0 hours for "draft of memorandum, summary of litigation and status; conference with M. Lillie, R. Thorgren and S. Linsley regarding collection of AG accounts receivable (2.5); conference with A. Snyder and research regarding TRO and preliminary injunction against member creditors (2.5).

**29.** *E.g.,* 4000.12Z on 10/24/86, GWB bills .5 for "Lexis search regarding cases—Matheson." On

12/24/86, MWL bills 1.3 hours to "prepare for member lawsuits."

**30.** In February, 1987, in the 4000–12 billing statements, SLL bills the estate 16 hours to prepare for and attend meetings regarding accounts receivable collection at AG. *See* line entries 2/10/87, 2/11, 2/12, 2/13 and 2/16/87.

**31.** *See* 4000–12C billing statements: three attorneys worked on a motion to dismiss filed by Tempora. Additionally, in 1/1987, DLH researched and drafted a memorandum in opposition to motion to dismiss based on 28 U.S.C. § 157. Yet in 11/1986, various attorneys, including DLH, have done jurisdiction research and have billed it to the 4000–12 cost center. *See* the billing entries for 11/3/86.

early part of the case, the fees expended were disproportionate to the benefit served. In light of the foregoing, this Court concludes that it is appropriate to reduce by 50 percent SLL's and DLH's billings throughout this account category. This adjustment will sufficiently recognize the insufficiency, the duplication of effort and improper delegation. Accordingly, this Court disallows the fees for the period covered by the First Fee Application in the amount of $16,852 and allows fees in the amount of $38,185 out of the $55,037 billed for that period.

 With respect to the fees requested for the remaining periods, this Court must conclude that they were of only minimal benefit to the estate. The debtor had made the decision to liquidate early and the hearings on the adversaries were vacated by the close of the time period covered by the First Fee Application. Moreover, the motion to determine the debt/equity issue had been filed during that same time, it was only discovery which continued thereafter.

The benefit obtained from the discovery conducted in this account category is questionable at best. The facts to be discovered would likely be the same as those discovered in the debt/equity litigation. H & D, however, has not guided the Court in their Application so the Court cannot discern if there was a unique benefit due to this discovery. Moreover, the Creditors' Committee and the Skaggs attorneys were involved in reaching the settlement on the debt/equity issue, thus H & D's role was further diminished. Accordingly, the fees *billed* for the remaining time periods covered by the Second, Third, Fourth, Fifth and Sixth fee Applications shall be reduced by 35 percent. Hence they are allowed $5,659.55 out of $8,707 billed.

In sum, the total fees allowed for these account categories are $43,844.55 out of the $63,743.50 billed.

As for costs, again H & D has billed for items which are non-compensable. There is $52.50 in delivery expenses which should be deducted from the total costs requested. Thus, expenses for these account catego-

ries are allowed in the amount of $1,560.72 out of the $1,613.22 requested.

8. Reclamation Matters (4000.3–.3N)

| | Billed |
| --- | --- |
| FEES: | $58,961.75 |
| EXPENSES: | 1,801.72 |
| HOURS EXPENDED: | 540.80 |

 H & D billed these fees in connection with the reclamation claims. In the very early part of the case, specifically within the first 10 days, AG received over 120 demands for reclamation of goods by trade creditors who had allegedly sold and delivered certain goods on open account to AG. The demands sought recovery of goods valued at approximately $3 million.

The greatest percentage of these fees were incurred, of course, during the time period covered by the First Fee Application. Time was spent researching 11 U.S.C. § 546 and insolvency issues, which were impacted by the answer to the debt/equity question. A significant amount of time was spent analyzing whether the demands as made complied with Section 546, and reviewing AG's books and records to verify the amounts of the demands. According to the Final Fee Application, this process was complicated not only by the disarray of the debtor's books and records, but also by the fact that most of the goods were "fungible in nature and could not be clearly traced as being in the debtor's possession as of the date of the demand."

The Creditors' Committee objected to the fees billed in these categories. Both the Creditors' Committee and the billing statements indicate that H & D instructed the debtor, after researching pertinent issues, on the method of calculating the amounts of the claims. It was subsequently realized by all involved, especially the Creditors' Committee and debtor's new counsel, that the numbers provided by AG at the outset were substantially in error. As a result the burden fell to the Creditors' Committee to retain accountants to reconcile the books and records and completely reevaluate all reclamation claims. In addition, some time was spent by O & J, *et al.*, reevaluating these claims. Hence, the Committee objected due to the lack of bene-

fit from much of the time spent in these categories.

In response to the Creditors' Committee objection, the debtor argues that the estate would have been required to hire an accountant sooner or later to evaluate these claims. While that may be the case, the amount of fees incurred call into question the amount of H & D fees which were of no benefit or duplicated by the efforts of Ernst & Whinney, the accountants, or O & J, *et al.*

The same problems which were pointed out in previous analyses exist in these categories: the duplication of effort, inadequate billing statements and excessive time billed. As the Court has pointed out throughout this Opinion, new associates have spent excessive amounts of time researching relatively sophisticated areas of bankruptcy law. In addition, a number of different attorneys researched the same issues.[32] The attorneys failed to adequately communicate or distribute information among themselves which resulted in duplication and the billing of excessive time.

There are also instances when attorneys have double-billed for their attendance at depositions or conferences.[33] On two occasions both SLL and MWL attend the same deposition and bill the estate their full hourly rates.[34]

 It is also clear that attorneys are billing for performing clerical functions. MWL bills the estate 2.4 hours for "scheduling other depositions."[35] On January 21, 1987, DLG bills 1.5 hours for, *inter alia,* "organization of reclamation files." On January 19, 1987, he bills 1.0 for research and organization of reclamation files. While there may be times when a law firm may deign to have a junior associate organize a file, the estate should not pay for what is a clerical task.

Having made these comments, the Court returns to the third level of analysis which considers what benefit these services provided to the estate. The compilation of claims and research performed was of some benefit although the advice to the debtor regarding claims calculations was not. Except for a few entries,[36] the inadequacy of the explanations or "lumping" services together make it impossible to determine what time is spent for what. It is very difficult, therefore to determine the extent of the benefit the services of H & D were to the estate. Because of these inadequacies, the Court concludes that a 40 percent reduction of the fees billed is appropriate. Accordingly, they will be allowed fees in the amount of $35,377.05 out of the $58,961.75 billed.

With respect to the expenses, H & D requests $1,801.72. H & D has included non-compensable items, it also failed to adequately list and explain the use of computer research services. Accordingly, the $306.58 of computer research costs, the $10.00 of delivery charges and the $11.00 of Federal Express or express mail charges shall not be allowed. Thus, the expenses requested in these categories are allowed to that extent of $1,474.14 out of the $1,801.72 requested.

9. Employee Claims (4000.9–9D)

| | Billed |
|---|---|
| FEES: | $27,117.50 |
| EXPENSES: | 566.56 |
| HOURS EXPENDED: | 252.95 |

H & D requests these fees for services rendered to AG for obtaining court approval to pay prepetition wage claims pursuant to 11 U.S.C. § 502 and certain workman's compensation claims which exceeded the bond posted by AG to cover such claims, and obtaining a TRO to prevent Blue Cross and Blue Shield from terminating employee

---

**32.** *See* 11/11/86 and 1/27/87 in account categories 4000.3A and 4000.3, respectively. DLH researches the insolvency issue and bills the estate 4.0, and on November 11, 1986, GWB bills 3.8 hours researching the same issue. *See also* 4000.3 the entries on 10/13/86, for ACS, and 4000.3A, 10/20/86 for RLT where each researching reclamation rights.

**33.** *See* 4000.3A entries on 1/23/87 ACS and DLH bill for interoffice conference.

**34.** *See* 4000.3A entries on 12/12/86 and 12/15/86.

**35.** *See* 4000.3A entries on 12/12/86.

**36.** *See* 4000.3 entries on 11/20/86, 10/23/86, 10/17/86 and 10/14/86.

insurance during contract negotiations. H & D also asserts that it assisted the debtor in union relations.

The Creditors' Committee originally objected and subsequently withdrew its objection based on information which the debtor provided to it. Specifically, the Court gathers from the Committee's partial withdrawal that H & D asserted that a substantial portion of the fees were incurred in responding to investigations by a union representing former employees alleging a conspiracy between UBD and competitors of AG.

The Court has reviewed all of the billing statements for the account categories, 4000.9–9D. Within the period covered by the First Fee Application, 4000.9C, "Health Insurance," and 4000.9, "Employee Relations and Union Matters" were the two areas in which the greatest amounts of fees were charged. Each is discussed below.

### a. 4000.9C

■ The Court will first examine the inadequacies in the billing statements. The problems which the Court has observed thus far are notable in these statements as well. Specifically, in 4000.9C there are a number of completely unexplained or inadequately explained telephone calls or conferences.[37] The explanation that a call is billed regarding "Blue Cross contract" does not tell the Court the substance of the conversation or the purpose for it. Thus, there is no way of evaluating its merit and whether the time spent is reasonable.

■ There is no direct relationship between the amount of time billed and the explanation required, clearly the more time one bills the more one should justify his/her expenditure. Moreover, considering that this fee application requests fees in excess of $1 million and the fees of other counsel and professional persons aggre-

**37.** Note the entries for the following dates:

| Date | Line Entry | Initials of Attorney | Amount of Time Billed |
|------|------------|----------------------|-----------------------|
| 11/4/86 | Conference with B. Bloom regarding Blue Cross contract (.4); conference with Blue Cross and B. Bloom (3.2) ... | MWL | 3.6 |
| 11/5/86 | Telephone Calls from B. Bloom and J. Gigax Regarding Blue Contract (1.6) | MWL | 1.6 |
| 11/6/86 | Calls from B. Bloom regarding Blue Cross (1.2); call to | MWL | 2.1 |
| 11/6/86 | Conference with M. Lillie and B. Bloom regarding Blue Cross contract (1.0); research obligation to stay current and to discuss with D. Honeck (2.0; meeting with M. Lillie and B. Bloom to review contract (2.0) | SLL | 5.0 |
| 11/10/86 | Telephone Calls from J. Gigax and B. Bloom regarding Blue Cross; | MWL | 1.1 |
| 11/12/86 | research regarding Blue Cross/Blue Shield; edit memorandum in support of application for preliminary injunction; research at Supreme Court Library; | SLL | 5.0 |
| 11/21/86 | Memorandum on contempt (1.3) Blue Cross/Blue Shield Paper (1.5) ... | SLL | 2.8 |
| 11/25/86 | Telephone calls from B. Bloom regarding Blue Cross contract | MWL | 1.2 |
| 12/1/86 | Blue Cross—telephone conference with E. Alter of creditors' committee and B. Bloom and J. Gigax of Blue Cross | SLL | 1.5 |

gate approximately $800,000, these fees must be scrutinized.

As for the second level of analysis, the time spent per task, again the Court found excess. Both SLL and MWL billed the same conversations with B. Bloom.[38] Additionally, SLL continued to bill the estate a fair amount of time for her discussions with DLH. The estate should not bear the burden of this duplication and excess.

Finally, the Court cannot discern the benefit which inured to the debtor from these service. The direct testimony affidavits and the First and Final Fee Applications contain no significant information to assist in evaluating the benefit and propriety of these fees. Clearly, H & D indicated that a TRO was necessary to maintain health insurance and that coverage was continued as a result of these efforts through February 28, 1987. AG, however, ceased operating on December 2, 1987. While the plausible explanation might be that it was necessary to maintain the coverage to allow for claims previously made or that employees were phased out gradually thereby requiring continued coverage, this is only speculation. The Court cannot discern from the Applications the full benefit of these services.

Accordingly, due to these inadequacies, and the absence of any meaningful explanation, this Court concludes that a reduction in these fees in the 4000.9C cost center by 30 percent is appropriate under the circumstances. Accordingly, H & D will be allowed fees for the 4000.9C cost center in the total amount of $5,461.40 out of $7,802 billed.

The First Fee Application noted that the expenses for the period covered by that Application were included in the 4000.6 cost center. It is very difficult for the Court to sort out among those costs which are attributable to these services and which are not. However, because the Court has already addressed and reduced those expenses in the 4000.6 cost center, none will be taken here.

**b. 4000.9**

The next largest amount billed is attributable to what H & D captioned "Employee Relations/Union Matters." The First Fee Application describes that H & D researched and advised the debtor regarding its rights and duties with respect to each of the collective bargaining agreements to which it was a party with the Unions. Half of the debtor's 550 employees were Union members.

The Court will combine its analysis of the obvious problems with the billing statements and the reasonableness of the time spent per task. Assuming arguendo that the research in this category was necessary, the billing statements indicate that H & D's approach to this research was disorganized and duplicative. Several different attorneys researched the same issue.[39] SLL reviewed a memorandum prepared by DLH and drafts another memorandum to

---

**38.** *See* 4000.9 on 11/6/86 entries for SLL and MWL.

**39.** Note the entries for the following dates:

| Date | Line Entry | Initials of Attorney | Amount of Time Billed |
|------|-----------|----------------------|----------------------|
| 11/6/86 | Review law review on labor contracts (.5) ... | ACS | .5 |
| 12/4/86 | Research rejection of labor contract ... (other entries deleted) | SLL | 6.5 |
| 12/11/86 | Research rejection of collective bargaining agreement in liquidating reorganization | SLL | 1.5 |
| 12/12/86 | Review of matters relating to rejection of collective bargaining agreements | MWL | .4 |

ACS regarding the same topic.[40] This is "overkill."

As for the analysis of the benefit received, again the Court had trouble discerning the benefit to the estate for these services. There is no doubt that H & D's ability to give the debtor ready advice was impeded by the then recent amendments to the Bankruptcy Code governing rejection of collective bargaining agreements. Regardless, there is no indication in the billing statements, the fee applications and the direct testimony affidavits that the debtor either intended to or actually rejected the collective bargaining agreements. Moreover, it would seem that once the debtor ceased operating and moved into a liquidation mode there would be no employees to be bound by any collective bargaining agreement. Consistent with most of this application, the explanation is woefully inadequate. Hence, it is quite difficult to glean what benefit the estate gained by the course of action or inaction it took with respect to these agreements.

This Court concludes, therefore, after reviewing the narrative and the billing statements that an across-the-board reduction of 30 percent is appropriate. Thus, of the $7,796.75 in fees requested for this cost center, ($6,228.75 of which was incurred during the period covered by the First Fee Application), H & D is allowed fees in the amount of $5,457.73.

As for expenses, there should be a reduction for $80 worth of telecopies billed to this category. There is no justification for this expense and it is non-compensable.

| Date | Line Entry | Initials of Attorney | Amount of Time Billed |
|------|------------|----------------------|-----------------------|
| 12/12/86 | Research regarding rejection of collective bargaining agreements and conference with S. Linsley; | DLH | 1.0 |
| 12/15/86 | Research regarding assumption or rejection of AG collective bargaining agreements and draft memorandum of law; | DLH | 3.0 |
| 3/16/86 | Research regarding assumption or rejection of collective bargaining agreements; draft memorandum; Conferences with B. Bloom and M. Severence; | DLH | 4.5 |
| 12/17/86 | Research and draft of collective bargaining agreement memorandum; | DLH | 2.0 |
| 12/18/86 | Research Section 1113 on rejection/assumption of collective bargaining agreement; | SLL | 2.6 |
| 12/20/86 | Review D. Honeck's memorandum regarding collective bargaining agreement and draft memorandum to A. Snyder; | SLL | .8 |
| 12/22/86 | Redraft collective bargaining agreement memorandum and conference with S. Linsley; research regarding Teamsters' motion to escrow sale proceeds and conference with M. Lillie; | DLH | 4.0 |
| 12/29/86 | Review Memorandum of Law Section 1113 Rejection; | ACS | .4 |
| 3/2/87 | Research regarding rejection of collective bargaining agreement; | DLH | 1.5 |
| 3/4/87 | Research regarding rejection of collective bargaining agreement; review of workmen's compensation claims; | DLH | 2.5 |

**40.** *See* 4000.9 entry on 12/20/86 by SLL for .8 hours.

Accordingly, H & D is allowed expenses in the amount of $434.39 out of the $514.79 requested.

c. 4000.9A, .9B and .9D

 The 4000.9A and 9B fees in the aggregate are substantial. As best this Court can determine, the 4000.9A included services performed in connection with the payment of prepetition wages and benefits [41] and, .9B, workmen's compensation claims.

These account categories are no exception to the pattern established in this case thus far. The explanation in the Final Fee Application is inadequate and there is no mention whatsoever of these categories in the Third and Fourth Fee Applications leaving the Court without any narrative explanation to assist it in evaluating the value of these services.

The Creditors' Committee has withdrawn its objection to the fees billed in this area based on some information provided to it by the debtor's counsel. That information purportedly states that a substantial portion of fees incurred were for defending certain claims of conspiracy between UBD and the debtor. The Court has looked at almost each and every entry on these billing statements and there is nothing in any of them which supports that contention. Clearly, there is no mention of such services in any of the fee applications and, as mentioned above, there is no narrative at all regarding these account categories in the Third and Fourth Fee applications when the most substantial portion of these fees were incurred.

The Court will succinctly conduct the three level analysis of these categories. In brief, the Court finds there are inadequately explained entries, duplication [42] and excessive billing. For example, various attorneys bill multiple conferences with B. Bloom. From these entries the Court can only infer that the attorneys were disorganized.[43] Because of this apparent disorganization, it is unlikely that the services as billed contributed commensurate value to the estate.

Based upon the cumulative effect of all of these problems, the Court determines that it is appropriate to disallow 25 percent of these fees, including those requested or category .9D. Accordingly, H & D will be allowed fees in the amount of $8,684 out of the $11,578.25 billed.

The total fees allowed H & D for all .9 account categories is $19,603.13 out of $27,-177 billed. H & D is allowed expenses in the total amount of $486.16 out of the $566.56 requested.

10. Lessor Claims (4000.10)

| | Billed |
| --- | --- |
| REQUESTED: | $24,340.50 |
| EXPENSES: | 1,073.24 |
| HOURS EXPENDED: | 231.00 |

 The Applicant alleges that a majority of these fees were incurred in representation related to the substantial number of equipment leases which AG held as a critical part of its operation of the Aurora warehouse, and the claims arising out of those leases. The Final Fee Application states that, "Hughes & Dorsey researched standards for such claims and reviewed all leases to determine whether they were true leases or security agreements." H & D negotiated settlements with several real property and equipment lessors, reducing the administrative claims by approximately

---

**41.** With respect to .9A fees, payment of prepetition wage claims are limited by Section 502. Therefore, the Court wonders what negotiations were necessary.

**42.** In addition to the double billing noted in the text, MWL bills 1.8 hours for a conference with G. Gallus and B. Bloom regarding petitions while CHS bills an unspecified portion of 7 hours billed for the very same conference in the 4000.1 account category.

**43.** At the outset of this case, on October 13, 1986, CHS bills the estate 2.5 hours in the 4000.9A account category for a conference with B. Bloom at AG regarding employee wages and other benefits. On the following day, October 14, 1986, MWL bills 1.1 hours for conferences with B. Bloom regarding wage matters. On October 15, 1986, WLP bills six hours for a meeting with ACS and "work on petition regarding wages." On that same day DLH bills 8.5 hours for attending "conferences" regarding wage and benefit application and notices; and research. On October 20 and 22, 1986, both MWL and ACS bill the estate approximately one hour for yet another conference with Mr. Bloom on wage and benefit motions.

$300,000. H & D describes that the debtor was either a party to or a guarantor of "numerous leases and subleases of eight separate real properties and over 40 equipment leases." The Court has no way of knowing on which of these the debtor was a guarantor and to which the debtor was a party. This distinction is important insofar as it determines whether the claim to be paid is a general unsecured or an administrative expense claim. It is equally unclear whether this $300,000 reduction was accomplished by litigating one or all 48 leases and, therefore, how the fees billed correspond to those efforts.[44]

In the Third Fee Application, wherein approximately one-third of these fees are requested, and the direct testimony affidavit of Mr. Snyder, H & D attributes the $300,000 reduction in administrative claims to the fact that in many instances the lessors' requests for administrative expense were greatly in excess of the appropriate administrative expense amount. Mr. Snyder testified that this was due, in part, to differing opinions as to the method of calculating those postpetition claims.

It is important to note that the Creditors' Committee was integrally involved in these negotiations to settle the lessors' administrative claims. Thus H & D was not primarily counsel but only served a complementary role.

Some general comments regarding the nature of the law in this area are appropriate. Section 365, which governs the acceptance or rejection of leases and Section 502, which limits the claims of real property lessors, are the operative provisions. With respect to the real property leases, Mr. Snyder stated in his Direct Testimony Affidavit that "the transactions associated with many of these leases are discussed in further detail in connection with the sale of particular assets." In addition, the Appli-

cant carefully points out that none of the time billed in this cost center is billed elsewhere. However, the significance of whatever explanation is provided in this cost center is undermined to some degree to the extent that services for lessor claims are billed elsewhere. It is impossible to determine the total amount of fees spent on lessor claims. Even if one looks to those asset sale account categories, one cannot decipher how much time was spent in negotiations, presumably, to assume those leases. Although it was not necessarily intended as such, this fragmentation suggests some subterfuge.

As for the first and second levels of review, the Court finds inadequate entries in the billing statements, duplication and excessive time billed. An example of inadequate line entries comes from KLB's time spent on "other miscellaneous" billed in the 4000.8B category. On February 19, 20, 24 and 25, 1987, KLB billed a total of 8.9 hours with that explanation. Of the 10 hours billed by KLB on February 19, over half is attributable to "other miscellaneous." The Court finds this outrageous.

With respect to the allegation of H & D that there is no duplication of fees for services billed to other account categories pertaining to lease matters, the Court notes to the contrary. Specifically, an excessive amount of time is spent researching the *general* tenets of Section 365 in both the 4000.8B and 4000.10 account categories. For example, SLL researched the question of rejecting certain leases in the 4000.10 category and both DLH and GWB researched that issue in the 4000.8B category.[45] It is curious that SLL researched the question of accepting or rejecting executory contracts some time after drafting a memorandum regarding that issue.[46] The total amount of research time billed in the 4000.10 category is 13.2 hours, the majority of which appears to be duplicative of re-

---

44. What the Court gleans from the billing statements for the Third Fee Application is that most of the motions for payment of administrative expenses were filed and settlement thereof entered into during that period. The Court was able to detect that at most 14 lessors, real or equipment, were referred to, eight of whom had filed proofs of claims or requests for administrative expense. Four or five of those eight

appear to have been resolved by stipulation. The remaining were handled by O & J, *et al.*

45. *See* 10/15/86, line entries for 4000.8B and 4000.10.

46. *See* the line entries for 10/15/86 and 10/28/86.

search conducted in the 4000.8B account category. A total of 35.6 hours is billed for Section 365 research to the 4000.8B cost center (sale of the Sax Food Stores). The Court recognizes that particular facts give rise to different issues under any given provision of the Code, such as the implication of a debtor as lessor under Section 365, but the amount of time spent in this case is unwarranted.

The unique question researched and billed in the 4000.10 category was whether the lease of equipment was a true lease or a security interest. That research, however, is governed by state law and not Section 365. Regardless, only 1.9 hours was spent researching that difference.[47] The billing entries demonstrate that the time spent is due to duplication, lack of coordination, failure to disseminate information and improper delegation to inexperienced associates, not due to the peculiarities of the case.

While comparing and contrasting these 4000.10 and 4000.8B, the Court observed an additional problem. The attorneys were billing various account categories on the same day for total time which exceeds that which is realistically billable on any given day. For example, in the very early part of the case, on October 16, 1986, a total of nine attorneys billed in the aggregate 60.25 hours.[48] Of that time AWS billed 6.9 hours in 4000.10 and the entries are almost unintelligible. MWL billed 2.9 hours to the

same category for a conference with Mr. Gallus which Mr. Staver also included as part of his 6.9 hours.

Even conceding that this was the early part of the case when an extraordinary amount of work must be done, the need for or reasonableness of such an excessive amount of time escapes the Court. H & D was not the primary counsel to settle the lessors' administrative claims. Thus, the Court does not find that all of the services in this area fully benefitted the estate.

The end result of the inadequacies, duplication and excess is that H & D's fees for the 4000.10 cost center must be reduced accordingly. The fees requested for this cost center shall be reduced by 25 percent. Accordingly, H & D is allowed fees in the amount of $18,255.38 out of $24,340.50 billed.

As for the expenses, the Court should deny H & D's request for reimbursement for costs which should be included in overhead or were not sufficiently explained and justified. The $35 cost for telecopies and the $140.02 cost for computer research should be disallowed. Thus, of the $3,738.30 requested, $3,598.28 shall be awarded.

11. Pension Termination Matters (4000.11 and 4000.1101)

| | Billed |
| --- | --- |
| FEES: | $81,020.50 |
| EXPENSES: | 3,791.79 |
| HOURS EXPENDED: | 743.15 |

47. *See* 4000.10 on 11/12 and 11/15/86 by GWB.
48.

| 10–16–86 | | | | | | | | | |
| AWS | ACS | CHS | MWL | RLT | WLP | SLL | GWB | DLH | JG |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 4000.1 | | 4.2 | 10.9 | 3.3 | | | | | | 3.8 |
| 4000.2 | | 2.4 | | 2.0 | 2.3 | .4 | 3.0 | | | |
| 4000.3 | | 1.8 | | | | | | 6.75 | 2.0 | |
| 4000.3A | | | 1.0 | | | | | | | |
| 4000.8 | | | | 2.7 | | | | | | |
| 4000.8A | | | 2.0 | | | | | | | |
| 4000.8B | | | | 2.9 | | | | | | |
| 4000.9A | | | | | | .4 | | | 5.5 | |
| 4000.10 | 6.9 | | | | | | | | | |
| | 6.9 | 8.4 | 13.9 | 10.7 | 2.3 | .8 | 3.0 | 6.75 | 7.5 | 3.8 |

H & D represented the debtor in connection with the termination of its pension plan and the demand for withdrawal liability from the multiple employer pension plan administered by the Western Conference of Teamsters' Union. The termination of the pension plan involved intricate legal issues related to the various termination dates of employees and was complicated by recent significant changes in that area of the law. Because of the debtor's financial difficulties, AG did not make mandatory contributions to the pension plan thereby raising concerns whether a funding shortfall might develop. All-in-all, no shortage existed and the debtor was revested with approximately $1.8 million in excess funding. According the Direct Testimony Affidavit of Kevin L. Brown, it appears that the termination also required that the plan be amended and that the debtor negotiate with the IRS to insure that the termination did not adversely affect the plan's "qualified" status.

A separate but related issue involved the demand for payment of withdrawal of liability from the Teamster's Fund to which AG contributed. Again, due to the changing area of the law, research was necessary to properly analyze the debtor's rights and determine the best approach to represent the debtor in this matter. The Creditors' Committee participated in a consultation role with the debtor's counsel. Ultimately, the issues were resolved by arbitration and H & D's litigation counsel assisted in this matter. The arbitration was settled and the Teamsters' Fund claim was reduced from $529,000 to $150,000. Bankruptcy Court approval was obtained for the settlement and the arbitration proceeding was eventually dismissed.

H & D interviewed and consulted with actuaries with respect to both the termination and the withdrawal liability area. H & D consulted with the actuaries on the reversion question, to complete annual filing requirements and with respect to the Union plan to assist in determining the potential withdrawal liability. Finally, the IRS conducted an audit related to the termination of the debtor's pension plan. H & D negotiated with and channeled informa-tion from various sources to the IRS. Mr. Brown's affidavit states that considerable research and review of all pension plan documents was required, but that the audit was concluded favorably to the debtor.

The Creditors' Committee originally filed an objection to the fees incurred by H & D. After some discussion the Creditors' Committee withdrew its objection and thus there are none outstanding.

As for the first level of review the Court is pleased that there are few billing statement inadequacies. With very minor exceptions, the information provided is sufficient to determine the benefit these services provided to the estate. As a general rule, KLB, who billed the most significant amount of time in this cost center, allotted specific time entries after each billing entry. Services were not merely lumped together. He also provided more substantial information not only in the billing statements but also in the narrative so that the Court could determine exactly what services he was providing. He did not use mere catch-all types of phrases. One can read through these billing entries and sense the progress which was ultimately achieved. Although it is clear that the pension plan was overfunded and that the debtor was entitled to reversion, the legal services provided were necessary in order to realize that reversion.

In addition, it was necessary to negotiate and arbitrate the Teamsters' Fund claim to reduce the withdrawal liability which arose out of the debtor's decline in financial condition and the resulting cessation of contributions to that fund.

With respect to the second level of review, the only concern which the Court has is with regard to H & D's competence to handle this area *efficiently*. KLB received an LL.M. in taxation in 1984, only two years prior to this filing. There is no indication whether he had been involved in this area, a very specialized area, before taking on AG. While KLB may have been the best in the firm to handle the matter, there is no indication that he held the requisite skill to accomplish the result most efficiently. Considering (1) that H & D at no point hired outside counsel; (2) there was a con-

sistent level of inexperience throughout this case and (3) Mr. Brown's associate billing rate; this Court is inclined to conclude that he was relatively new to the area and did not have the requisite skill level to handle the matter as efficiently as experienced counsel in this area might have done.

As for the result obtained, the Court finds that the negotiations and arbitration of the Teamsters' Fund claim were necessary and beneficial services. The research and review were necessary to proceed with the audit which was concluded in favor of the debtor.

Accordingly, the Court concludes that a 10 percent reduction is appropriate. H & D shall be allowed fees in the amount of $72,918.45 out of $81,020.50 billed.

As for costs requested, the Court finds that H & D has included items which are non-compensable or were not sufficiently documented and justified to be allowed. Specifically, the following costs will not be allowed: $262 for the use of telecopies, $26.80 for delivery or courier services, $63.75 for the use of Federal Express or express mail, and $720.09 for the use of computers. Thus, out of the $3,542.40 in costs requested, H & D shall be allowed $2,469.68.

12. Litigation (4000.6–.6F)

| | Billed |
|---|---|
| FEES: | $136,758.00 |
| EXPENSES: | 12,065.90 |
| HOURS EXPENDED: | 1,378.95 |

 H & D, among its other duties, acted as litigation counsel for the debtor. The types of litigation handled by H & D can be placed in three categories: litigation commenced prepetition, a majority of which had been initiated by AG; postpetition actions to collect accounts receivable or liquidate claims; and mechanics' liens litigation which AG assumed in connection with the sale of the Sax stores.

In their fee applications and direct testimony affidavits, H & D has described the various litigation matters by when they were filed. Five significant cases were pending at the time the case was filed and others were initiated postpetition to collect amounts owed the debtor. They also separated out litigation relating to director and officer liability insurance and motions for relief from stay in a section captioned "miscellaneous."

With respect to the litigation pending at the time of the filing of the petition, H & D, as primary counsel for the debtor, settled two of the lawsuits: one (*AG v. Pachello*) for the full amount of the guarantee ($50,000) which would be applied against amounts defendant owed AG, thereby reducing both the amount of unsecured claim and also the cash into the estate dollar for dollar; and the other (*AG v. Moore*) for the full amount due, $16,115.69.

Another case which is referred to as the *Horton* case, was transferred to the new general counsel for the debtor during the discovery phase.

One of the two remaining cases, *Forsythe v. Associated Grocers*, involved a judgment obtained against the debtor for $300,000. The case was remanded for a third trial on the issue of damages and the matter was ultimately settled for $205,000. As for the other, the New Mexico warehouse litigation, H & D acted merely as secondary counsel in litigation which brought $74,000 into the estate.

The debtor also instituted actions postpetition. The greatest portion of these fees were generated in connection with the mechanics' liens claims. The debtor assumed the obligation to pay, compromise or contest these claims as part of the sale of the Sax stores. H & D alleges that two of the claims were settled and approved by the Court in the early part of the case. As to the remaining two claims, one in the principal amount of $190,000 and the other of $168,000, were litigated.

Of the two, one ultimately went to trial and was settled after the full amount of judgment was rendered against the debtor. The judgment was rendered at an interest rate lower than that requested by the plaintiff in that action. As part of that settlement the plaintiff gave up its claim to attorneys' fees.

The other action was settled shortly before trial and the settlement resulted in a compromise of the claim by approximately $35,000.

The Creditors' Committee objected to these fees because of its understanding that there were prospects for settling these various claims and that H & D delayed and was "obstreperous" in pursuing the litigation thereby compromising the ability to settle the claims advantageously. The Creditors' Committee particularly objected to the fees incurred in the mechanics' lien litigation. Notwithstanding the voluntary reduction, the Committee requests an additional reduction of $9,500.

■■■ In reviewing these account categories, as with all of the prior categories, this Court conducted the three-tiered analysis. As to the first tier, the Court notes that there are a significant number of unexplained phone calls, conferences and correspondence.[49] Additionally, there are a number of instances where attorneys have made phone calls to the court clerk.[50] These calls are described generally or not at all. These phone calls are typically to find out the status of an order, set a hearing, or clarify some type of court procedure. While the Court recognizes that there may be instances where a phone call to the court clerk may actually serve some benefit to the client, as a general rule it is not compensable as legal time. Each of these calls could be performed either by a secretary or, in rare instances, a paralegal and should not be charged as attorney time.

There are also a number of instances where attorneys are performing clearly clerical functions such as organizing files for depositions or setting trial dates.[51]

Ray L. Graham (RLG) has charged the estate 6.1 hours for, *inter alia* organizing files for Love deposition. On July 10 and August 1, 1987 in cost center 4000–6C, there are entries for organizing files. There are also instances of duplication.[52]

Mr. Thorgren's time is noteworthy. By and large his time spent has been spent efficiently and, although not without exception, can generally be evaluated. For the most part his explanations are sufficient and followed by some specific allocation of time per task.

The Court notes that during the period covered by the Third Fee Application in the 4000–6A category, the "billing partner" credited the debtor with $1,054 apparently to offset the time spent by LAC which was not only excessive but also largely clerical. A significant portion of her time was spent reviewing and organizing files and pleadings. As discussed above, that clearly is not attorney time.

With regard to the second level of analysis or the "time spent per task" tier, there appears to be too much time spent researching. During the period covered by the First Fee Application there appears to be excessive time spent researching removal issues;[53] and remedies for violation of the Section 362 stay. SLL spent somewhere between 13 and 15 hours researching remedies for violation of the Section 362 stay.[54] Additionally, MWL has spent 1.2 hours on bankruptcy court jurisdiction questions within the 4000–6 category on November 19, 1986. That issue was researched by various other attorneys both before and after this date. By that time the jurisdictional questions created by the *Marathon* decision were more settled such

**49.** *See* 4000–6 on 10/14, 10/18, 10/23, and 10/28/86, 11/10 and 11/14/86, 12/11, 12/12, and 12/16/86; 4000–6C, 4/9/87, 4/15/87, 5/13 and 5/18/87; 4000.6B entries on 7/1, 7/2, 7/13, 7/16/87, and 8/14, 8/21, and 8/31/87; 4000.6C entries on 7/2, 7/13, 7/15, and 7/20/87; 4000.6D entries on 7/17, 7/20/87 and 9/29/87.

**50.** *See* 4000–6B on 8/17/87; 4000–6C line entries for 7/2, 7/20, 7/21, and 7/29/87.

**51.** *See* 4000–6 on 10/14/86, 11/6/86, and 5/14/87.

**52.** *See* 4000–6 on 12/22/86, MWL and SLL billed 1.2 and 1.5 respectively; on 3/5/87 both ACS and CHS bill 3.6 an 3.0 hours respectively for attending the same client conference.

**53.** *See* 4000–6 on 10/28, 11/6 and 11/24/86.

**54.** *See* 4000–6 on 11/13, 11/14, 11/17 and 11/20/86.

that this amount of research is clearly excessive.

In the period covered by the Fourth Fee Application an additional example of excessive research time is found in account category 4000–605 (4000.6E). SLL spent an extraordinary amount of time researching the appeal of a bankruptcy court order and the standard of review. SLL billed between 6.5 and 10 hours in that endeavor.[55] SLL also spent 2.7 hours researching the standard of review for motions for relief from stay and considering the approach to the appeal with R. Thorgren;[56] 4.3 hours conducting similar research;[57] and 5.4 hours for other research related to appeals.[58] On July 7, 1987 in account 4000–6E, CHS has billed 1.0 for finding out what insurance is in effect. At the same time both MWL and SLL are working on the same question. The Court fails to see how it could take him that amount of time, especially in light of the fact that associates are billing time contemporaneously.

The third element which must be considered in reviewing the reasonableness of the fees charged is the overall result. There are some obvious questions which remain unanswered. Unsecured creditors were at risk to be paid either nothing or at most 30 percent of their claims.[59] While it does involve some hindsight, the Court ponders why the *Forsythe* case (and other cases pending on the date of petition) was not settled earlier and if the $12,000 in time spent by H & D truly benefitted the estate.

The same concerns resurface about the benefit of the actions instituted postpetition. Moreover, there is insufficient information to determine, particularly with re-

spect to the first two actions which settled right away, what the issues were and in whose favor the settlement was made. All the Court knows is that they were settled, presumably in favor of the lien claimants.

Throughout the case, H & D spent a lot of time and money in the pursuit of litigation that was not economically beneficial for the estate. The potential recovery did not justify the expense. The explanation provided in the direct testimony affidavits, at the hearing and in the fee applications, is insufficient to disabuse the Court of any notion to the contrary. Throughout the various fee applications submitted by H & D it boasts that at the time of the filing of the petition the debtor had more than $75 million in assets and $65 million in liabilities. Simple arithmetic suggests a cushion of $10 million. H & D further acclaims that it assisted in reducing the estate's liability by more than $25 million and bringing in $6 million in proceeds for the benefit of the estate. There is never any mention of the amount of unsecured claims paid. The Court can only deduce that this firm did not appreciate the impact bankruptcy should have had in their approach to litigation.

In light of the foregoing, this Court must conclude that a reduction is appropriate. The Court determines that it is appropriate for fees billed in these categories to be reduced by 30 percent. Therefore, H & D will be allowed fees in the amount of $95,730.60 out of the $136,758 billed.

With respect to the expenses requested, there are a number of charges for items such as deliveries or courier services, computer research time and telecopies. As dis-

55. *See* 4000–605 on 1/25 and 1/27/88, and 2/1 and 2/15/88.

56. *See* 4000.605 on 2/11/88.

57. *See* 4000.605 on 2/12/88.

58. *See* 4000.605 on 2/15/88.

59. The Amended Disclosure Statement filed by the Unsecured Creditors' Committee states "... the resolution of the debt-equity litigation could have tremendous impact on the distribution to any individual creditor. If members' claims are subordinated as equity, the members would re-

ceive no distributions, and all available funds would be distributed to unsecured creditors, which [sic] might realize approximately 30 percent of their claims. If the members' claims represent trust fund claims entitled to priority treatment, the members would receive all available funds, representing an approximate distribution of 35 percent of their claims, leaving no funds for distribution to the unsecured creditors. If the claims of members and unsecured creditors are treated equally, all creditors would realize approximately 16 percent of their claims. *Id.* p. 35.

cussed above, while such charges are fashionable absent further explanation, they are as a rule unnecessary. The following amounts will not be allowed: $165.50 for the use of telecopies, $405.52 in delivery and courier services, and $351.75 for computer research. Hence, H & D will be allowed costs in the amount of $11,143.88 out of the $12,065.90 requested.

13. *Miscellaneous (4000.5 and 4000.2)*

 There are some account categories which are not meaningfully explained in the narrative. The one which is most noteworthy is the 4000.5 cost center for work on the plan and disclosure statement. As noted in the Unsecured Creditors' Committee's objection to the Second Fee Application of H & D, "[n]o plan has yet been proposed. Allowances here should be deferred until some use and benefit is shown to the estate."

There was no explanation of the use and benefit served by the work in this category. Moreover, it was not possible to propose a confirmable plan without a resolution of the debt/equity dispute. That dispute was resolved after O & J, *et al.*, became counsel for the debtor. Furthermore, it was the Creditors' Committee that proposed the plan which was confirmed.

Thus, the Court concurs with the Creditors' Committee and finds that there was no use or benefit shown to the estate. Accordingly, those fees and costs in the amount of $3,437.73 will be disallowed.

 Another category that H & D failed to discuss meaningfully was category 4000.2. That account dealt with cash collateral matters and the motion for relief from stay filed by United Bank of Denver (UBD), the major secured lender of the debtor. H & D incurred $29,003.50 in fees and $299.53 in expenses in this category.

UBD was ultimately paid in full, but a dispute arose over its collection fees and costs which it attempted to recover under Section 506(b). That claim was ultimately reduced by approximately $200,000 pursuant to a stipulation dated May 13, 1988.

Particularly with respect to the settlement, H & D participated in a role ancillary to the Creditors' Committee. Moreover, some time was spent reevaluating the status of UBD's lien and supporting documentation. Steele Market objected to the fees for that time because H & D had been counsel to the debtor prepetition and had in fact assisted in negotiating the loan. In H & D's response to that objection, it did not deny its role, but argued that loan negotiations were different than the issues at hand and thus such review was appropriate.

As for the first level of review, there are a number of obvious problems regarding inadequate billing entries. The Applicant failed to break out the time spent on matters so that the Court can discern whether the time actually spent was necessary and reasonable.[60] There also were instances where clerical functions were performed by an attorney.[61] There also was a fair amount of duplication of effort and time.[62]

As for the review of the time spent per task, there is an excess in this category. For example, on November 11, 1986, four attorneys billed at least one hour each for a firm conference regarding notice by telephone. After the conference, the attorneys apparently gave the telephonic notice themselves instead of delegating the task to a secretary or paralegal.[63] In addition, two or more attorneys frequently attended various conferences and meetings.

As for the benefit received, the Court shares the concerns of Steele Market and its concerns are not allayed by H & D's

**60.** *See* 4000.2 on 10/14/86 by ACS and SLL; entries on 10/15/86 by ACS and KLB; entries on 10/16/86 by ACS and SLL; entries on 10/17/86 by ACS, CHS and SLL; entries on 10/21/86 by ACS and CHS.

**61.** *See* 4000.2 on 10/15 and 10/16/86 were WLP expends a total of .9 hours on providing and mailing notice of the cash collateral hearing.

**62.** *See* 4000.2 on 10/14, 10/17, and 10/21/86 for examples of several attorneys attending the same conferences.

**63.** *See* 4000.2 on 11/21/86 where at least five attorneys gave telephonic notice of the hearing to other creditors.

"response," which is weak at best. However, the estate was benefitted by H & D's objection to the Bank's collection costs which were subsequently reduced.

In light of the problems presented in the billing statements, the time spent per task and considering the benefit received by the estate, the Court finds that it is appropriate to apply a percentage reduction. Accordingly, the fees of H & D will be reduced by 25 percent and allowed in the amount of $20,347.13 out of the $27,129.50 billed. The expenses will be allowed in full in the amount of $299.53.

### 14. *Other Categories*

■ There are 64 separate account categories, the Court has in some fashion addressed all but thirteen.[64] It should not be necessary for the Court to go through and discuss the additional categories in detail.

Accordingly, the Court finds that based upon the consistent inadequacies, duplication and excess in billing, it is appropriate to apply a 15 percent reduction to the account categories which were not evaluated. Thus, the Court should allow fees of $59,662.84 out of the $70,191.58 billed in those categories. The expenses from those categories total $7,465.62 and they should be awarded in full.

## VI. CONCLUSION

In a bankruptcy case the debtor's success is not always easily measured. The Court has tried in the foregoing analysis where appropriate to evaluate the results obtained, clearly an overriding consideration. However, where the debtor has conducted a liquidating Chapter 11 the measure of success may be different than a Chapter 11 where the debtor reorganizes and continues in business. In any event, it is very difficult for a bankruptcy court to apply with any precision the *Johnson/Permian Anchor* standards.

■ Regardless, in its review the Court has evaluated and commented upon the time and labor required, the novelty and difficulty of the questions, the skill requisite to perform the service properly, customary fees, time limitations, amount involved, and the experience, reputation and ability of counsel. The exclusion of other employment is not particularly relevant nor is the award in similar cases. A majority of these elements are encompassed by the considerations outlined in *Blanchard v. Bergeron*.

The Court finds that it is appropriate to make additional general observations where H & D's performance did not fair well under the *Johnson/Permian Anchor* review.

First, the Court concedes and has conceded that there are certain issues presented that were novel, such as the reclamation claims, accounts receivable collections and the debt/equity question. These issues were inextricably intertwined with some of the litigation which had been instituted, the setoffs attempted by various of the members, and the effectuation of a plan. This still does not account for the substantial amount of fees billed. H & D has been unable to describe with any clarity or precision the benefit of its services and in rather conclusory fashion states that a number of difficult questions arose because of the debtor's unique cooperative association. It appears to this Court that the novelty and difficulty often escaped H & D and because of their inexperience they were often misdirected and disorganized.

Second, counsel represented this debtor prior to the Chapter 11 and apparently had a long-term relationship. Because of that relationship, H & D should have had greater familiarity with the debtor, its books and records and various of its documents, particularly the UBD loan documents which were subject to re-review during the bankruptcy case. Although that familiarity should have facilitated the efforts and translated into lower fees, it did not.

Third, in the very early part of the case as in the early part of any large Chapter 11 case, the pace was quick and a number of

---

**64.** The Court did not discuss the following account categories: 4000.8G, 4000.1300, 4000.1301, 4000.1302, 4000.1303, 4000.1304, 4000.- 1326, 4000.1400, 4000.1401, 4000.1500, 4000.-1501, 4000.1600, and 4000.1700. The total fees billed in those categories is $62,949.08.

attorneys were called upon to proceed in various directions in order to respond to the debtor's needs. Even conceding that as justifiable, there was no line drawn between fees which were necessary to adequately meet the immediate and pressing needs of the debtor, and the fees which resulted because counsel was misdirected.

Also, the Court recognizes that large firms must use their younger associates to perform certain tasks and also allow them to learn a given area of expertise. However, that does not mean the client or the estate should pay for their education. Both SLL and GWB had no prior background in bankruptcy. As counsel for Steel Market pointed out, SLL "cut her teeth" on this case. It was incumbent upon the partner who supervised those attorneys to credit the bill accordingly. In very few instances was that done.

Finally, through substantial amounts of time and effort analyzing these billing statements, the Court has uncovered the standard types of billing practices and abuses which were used by attorneys and resulted in excessive fees. This Court finds such practices offensive. Each and every attorney appears to have done all he/she could do regardless of the cost. As the Bankruptcy Court from the Northern District of Illinois so aptly stated in *In re Chas. A. Stevens & Company*, 105 B.R. 866, 872 (N.D.Ill.1989), "the estate is not a cash cow to be milked to death by professionals seeking compensation for services rendered to the estate which have not produced a benefit commensurate with the fees sought."

The tension which ran throughout this very large case was the need to organize and segregate information and the equal and opposite need to present it in a clear, concise and consolidated fashion. Specifically, the account categories were a method of organizing and segregating the types of services rendered so that there would be a clear record of the amount of services provided in connection with a specific issue. However, as evidenced by these billing statements, the problem is that the concept was frequently misused or abused. The

result was that the estate was overcharged.

In a case of this size and nature which extended over a number of years, and where there were several different judges involved, the Applicant cannot presume that the court is omniscient. The burden rests on the Applicant to provide the court with sufficient information to make a decision in its favor. Throughout this Opinion the Court has commented that the Applicant has not shouldered that burden and as a result its fees have been reduced. Accordingly, it is

ORDERED that based upon the aggregate of the awards set forth in this opinion, Hughes & Dorsey is allowed fees in the total amount of $756,622.56 and $64,063.89 in expenses.

FURTHER ORDERED that within 90 days from the date of entry of this Order Hughes & Dorsey shall disgorge and turn over to the estate $164,881.92 which is the amount that the prior payments to Hughes & Dorsey exceed the fees and costs awarded herein.